This was a civil action for actionable negligence, instituted by plaintiff W.H.H. Jones, administrator of Russell Jones, deceased, against defendant W.L. Bagwell to recover damages for alleged wrongful death of plaintiff's intestate, which occurred in the city of Raleigh, about midnight, 21 December, 1929, or the early morning of 22 December, 1929. This cause of action was first tried at Second April Term, 1931, of Wake Superior Court, before Judge G. V. Cowper, which resulted in a nonsuit. Upon appeal to the Supreme Court the judgment of nonsuit was affirmed by opinion rendered 21 October, 1931 — 201 N.C. 831. The present action was instituted on 12 April, 1932, and came on for trial before Judge Henry A. Grady at Second June Term, 1934.
At the close of plaintiff's evidence the court below rendered the following judgment: "This cause coming on to be heard before the court and jury, and the plaintiff having offered evidence and rested his case, and the defendant thereupon having moved the court for judgment as of nonsuit; and it appearing to the court that the cause of action declared upon in the complaint is identical with the cause of action declared in the complaint filed in Jones against Bagwell, tried at the April, 1931, Term of Wake Superior Court, in which a nonsuit, was entered at the close of plaintiff's evidence, which judgment of nonsuit, affirmed upon appeal, appearing in 201 N.C. Report, page 831; and it further appearing to the court that the evidence in the instant case is substantially the same as the evidence offered upon the trial of the first case; and it *Page 381 
further appearing to the court, in addition thereto, and the court being of the opinion that the plaintiff ought not to recover in any event upon the evidence offered in the instant case, the motion of defendant is allowed; and it is thereupon considered, ordered, and adjudged that the plaintiff be nonsuited, and that this action be dismissed at the cost of the plaintiff, to be taxed by the clerk of the Superior Court."
The plaintiff's exceptions and assignments of error were as follows: "For that the court erred in granting defendant's motion of nonsuit at the close of plaintiff's evidence.
"For that the court erred in rendering and signing judgment dismissing the action as of nonsuit, as set out in the record."
The material and necessary facts will be set forth in the opinion.
At the close of plaintiff's evidence the defendant made a motion for judgment as in case of nonsuit. C. S., 567. The court below sustained the motion, and in this we think there was error.
Upon motion as of nonsuit all the evidence is to be considered in the light most favorable to the plaintiff, and he is entitled to every reasonable intendment thereon and every reasonable inference to be drawn therefrom.
It is well settled that the evidence must be more than a scintilla to be submitted to the jury. If it only raises a suspicion, a conjecture, a guess, a surmise, a speculation, it is not sufficient, Denny v. Snow,199 N.C. 773 (774).
N.C. Code of 1931 (Michie), sec. 2618, in part, is as follows: "No person shall operate a motor vehicle upon the public highways of this State recklessly, or at a rate of speed greater than is reasonable and proper, having regard to the width, traffic, and use of the highway, or so as to endanger the property or the life or limb of any person: Provided, that no person shall operate a motor vehicle on any public highway, road, or street of this State at a rate of speed in excess of:
"(A) Twenty miles per hour in the built-up residential section of any village, town, or city: Provided, that on any highway, road, or street entering any city, town, or village the built-up residential section shall be construed to being at the first point, between which point and a point one thousand feet away on said street, road, or highway where there are as many as eight residences." . . . Part of (F) is as follows: "The governing body of every incorporated city or town shall have authority, by ordinance, to make reasonable street-crossing regulations." Public Laws of 1925, ch. 272. *Page 382 
Section 2617 (a), in part, is as follows: "This act shall not interfere with the regulations prescribed by towns and cities." Public Laws of 1927, ch. 120. See sec. 2621 (46).
Section 5 of the Traffic Ordinances of the city of Raleigh is as follows: "It shall be the duty of every person driving or operating any vehicle to obey instantly any directions that may be given by a traffic officer; to slow down upon approaching each street intersection orpedestrian in the street so as to pass such intersection or pedestrian at aspeed not exceeding ten miles per hour; and in the case of a motor vehicle or street car, to sound the horn or bell of such vehicle or car, in warning upon the approaching of Hillsboro Street and Glenwood Avenue, to slow such vehicle or street car to five miles an hour, to sound horn or bell." (Italics ours.)
In Hendrix v. R. R., 198 N.C. 142 (144), is the following: "It is well settled in this jurisdiction that the violation of a town or city ordinance, or State statute, is negligence per se, but the violation must be the proximate cause of the injury. Ordinarily this is a question for the jury, if there is any evidence, but, if there is no evidence that the violation of the ordinance or statute is the proximate cause of the injury, this is for the court to determine." There must be a causal connection between the violation of the statute and the injury inflicted. Burke v.Coach Co., 198 N.C. 8 (13).
Was there any or sufficient evidence to be submitted to the jury that defendant was exceeding the speed limit contrary to the law of the road? We think so. The evidence on the part of plaintiff was not direct, but circumstantial, yet under well-settled law he was entitled to every reasonable inference to be drawn from the evidence.
The testimony of Neill Hester was to the effect that he was driving a Model-T For sedan on Hillsboro Street, traveling east towards the Capitol, approximately one half block away — some 200 feet — running fifteen to twenty miles per hour.
He further testified, in part: "The first indication I had of this accident was when I noticed two headlights approaching me approximately half a block away, and there was a jerk to this side; that would be toward my left, or toward the east side. No, it would be to the south side of Hillsboro Street; but when I noticed the lights going out I was not impressed even with that that an accident had occurred until I had traveled almost the length of the block going east, when I noticed a form, appearing to be a human form, lying in the middle of the car track. Then I saw somebody had been hit. . . . I saw the person, when I got there, was apparently dead or unconscious. I did not examine his pulse to see if he were dead or not. There was a trickle of blood from under his head about five or six inches long. About that *Page 383 
time I noticed a car up the block, west from where the form lay, and I started up there to see if that was the car that figured in the accident, and got about one-third of the distance when I met a man walking towards me or towards the form, whom I later learned was Mr. Bagwell. I did not know him personally then. . . . I kept on going until I came to this car and went around to the front end of it and saw that the right headlight wasmashed in and bent back, and that satisfied me. . . . From the time I saw the lights go out on Mr. Bagwell's car, until I parked in front of the A. 
P. Store, I did not see any cars pass going either in an easterly or westerly direction. . . . The car that struck this body was traveling west. To the best of my recollection, the head was lying west and the feet east. It was almost in a straight line between the car tracks. In other words, the body was lying on a north and south line in the north car tracks. . . . I presume that when the lights went out is when the body fell; that was the conclusion I arrived at, but I don't know. . . . I should say that a person with ordinary vision, driving an automobile in a westerly direction at that point, could see everything that was at that intersection. . . . I was across the bridge when the lights went out on Mr. Bagwell's car — I'd say 200 feet or more away."
M. F. Arnold testified, in part: "I just saw the spot of blood and the parked car. The spot of blood was right in this track (indicating on map), where this track this goes to the barn. It was on the north side of Hillsboro. . . . I examined the place carefully. I saw Mr. Bagwell's car and stepped the distance from the place I found the blood stains to his car. As I remember, it was 71 steps. . . . The headlights were broken onthe car. . . The right front main headlight was bent back or around." He further testified that, on the former trial, Bagwell told him plaintiff's intestate "jumped out in front of his car and he could not avoid hitting him."
E. M. Warning testified, in part: "I was standing in front of the Manhattan Lunch Room on the corner of the intersection between, or on the corner of the intersection of Glenwood Avenue and Hillsboro Street, which is one block from the intersection of Hillsboro and West streets. I was standing on the south side of Hillsboro Street looking towards the north side, drinking a coca-cola.
"My attention was attracted by hearing a thud as though a car struck arough place in the street or hit something. It sounded like it might have hit a bag or something. I turned and saw this car come to a stop. I turned instantly upon hearing the noise. I turned to my right; to the east of where I was standing, and saw the automobile coming to a stop. I would sayit was going between thirty and forty miles an hour when I first saw it,and coming to a stop. That was just a fraction of a second *Page 384 after it hit the object. I went up there and someone in the crowd said the car belonged to Mr. Bagwell.
"The automobile was traveling in a westerly direction on Hillsboro Street. When I first saw it it was approximately twenty-five feet from the intersection of West and Hillsboro streets. . . . I turned my face to theright just a second from the time I heard the thud, I'll say the automobilewas traveling not less than thirty miles an hour when I first saw it comingto a stop here in the vicinity of the billboard. . . . There was no obstruction to the traffic in front of the Bagwell car until I got there; Idid not see any traffic passing either in an easterly or westerlydirection, west of West Street on Hillsboro Street. From the point where Ifirst saw the Bagwell car until where it stopped, I would say, was 175feet. I did not measure it or step it off. . . . There were no lights burning on the car when I first saw it. . . . It was after twelve at night and traffic had just about died down. There was practically no traffic . . . . I had a clear view from where I was standing to the point where the body lay. I saw the Bagwell car within a split second after it strucksomething, because I turned my head as I heard the noise. . . . When I first saw the Bagwell car it had no lights on it. I had no difficulty in seeing it. When I saw it it had a street light between me and the street and I had a clear vision of the car. I could see that easily: . . . I was approximately a hundred feet from the corner to the bridge. I suppose anybody in the intersection of West and Hillsboro streets, in the street, would have had a clear view of any car approaching from the east or west; I don't know about anybody else. . . . That would have put me the distance away of the bridge, 80 or 90 feet, plus the total distance from the east end of the bridge back to the intersection of West and Hillsboro streets."
Ellis Lundy testified, in part: "On the night of 21 December, 1929, I was on Hillsboro Street at the hot-dog stand. I had just gotten out of the car. I came from the west and was parked on the bridge just before you get to the hot-dog stand. After I parked, I heard a thud sound from downtowards the Standard Filling Station, which is on the northern side ofHillsboro Street on the corner of West and Hillsboro. I turned my head and looked down there, and then I could see this fellow lying in the street. I ran down there to him.
"When I turned my head I saw the Bagwell car. That was instantly, after the thud. It was coming west. It appeared to be coming from toward the Capitol. I would say it was moving 40 miles an hour. Of course, I don't know. It was a right good distance from me. That is my estimate. It was coming directly towards me. I was parked on the same side of the street as the Manhattan Lunch. The Bagwell car continued up to about the billboard and stopped there. *Page 385 
"I did not see any car traveling either in an easterly or westerly direction from the time I heard the thud until I got to the body. . . . I rushed down there and the fellow was bleeding from his eyes, ears, and mouth, and everywhere. I helped pick him up and put him in the car. . . . I also went to the hospital. I held his head in my lap in the car. I got in the car first with my arms under his shoulders. There was a hole in hishead about as big as your two knuckles. I think there was an are light at the center of the intersection of West and Hillsboro streets."
Eugene Utley testified, in part: "On 21 December, 1929, I was assistant manager of the store at 415 Hillsboro Street. The store was on the southeast corner of Hillsboro and West streets. . . . On the night of 21 December, 1929, from about 11:15 to a quarter after 12 I was dressing the window of the store. I had closed for business at ten-thirty. The windows were also closed and also the doors. I heard a very hard crash on thestreet. About thirty seconds later someone drove up in front of the store and said somebody had been hurt. It was Mr. Hester of the News Observer, who notified me; I found the body lying on the car track of Hillsboro Street, on the north side."
The testimony of the opinion of witnesses as to the speed of the death car was competent.
In Hicks v. Love, 201 N.C. 773 (775-776), is the following: "Subject to the defendant's exception, several witnesses who saw the sedan and at the time were impressed by its speed were permitted to express their estimate, some saying that in their opinion it was running at the rate of fifty miles an hour, and others at a rate not less than sixty. . . .
"In his Commentaries on Evidence, sec. 1264, Jones cited a large number of cases in support of the rule, which he states as follows: `A person of ordinary intelligence, having opportunity for observation, is competent to testify as to the speed at which an automobile was being operated at a given time. The rate of speed of an automobile on a public highway is a matter of which people generally have some knowledge. It is not a matter exclusively of expert knowledge or skill. As above stated, where the rate of speed of such a vehicle is material in an action, any person of ordinary ability and means of observation who may have observed the vehicle may give his estimate as to the rate of speed at which it was moving. The extent of his observation goes to the weight of his testimony.' Lewis v. Miller, 70 A.L.R., 532, 549."
As to the reasonable inferences drawn from the evidence that defendant was exceeding the speed limit, are: (1) Two witnesses testified, in their opinion, immediately after the collision, defendant was running over 30 miles an hour. (2) The blow of the collision was heard several hundred feet away. (3) Defendant's car stopped some seventy-one steps. *Page 386 
away from bloodstains in the street. (4) Lundy's testimony: "There was a hole in his head about as big as your two knuckles."
Was there any evidence that the speed of the car was the proximate cause of the injury? We think so. We think there was evidence to be submitted to a jury as to the casual connection between the speed of the car and the injury, and there was evidence to be submitted to the jury that the speed and operation of the car was the proximate cause of plaintiff's intestate's death. The defendant had a clear vision of the intersection of Hillsboro and West streets, which the evidence indicated plaintiff's intestate was crossing, going west at the time he was hit. There is evidence to be submitted to the jury that defendant was exceeding the speed limit. It was also in evidence that defendant left the bowling alley on West Davie Street between 11:30 and 12 o'clock the night of the injury, where he had been bowling.
H.I. Stell testified, in part: That in 1925 or 1926 "he told me one of his eyes was bad."
Dr. Louis N. West, eye, ear, nose, and throat specialist, testified, in part: "I know the condition of his eyes, in 1929, in December. He waspractically blind in his right eye and had normal vision in his left eye. The vision of his right eye evidently was not capable of improvement."
In Craver v. Cotton Mills, 196 N.C. 330 (333), speaking to the subject: "Accepting the familiar definition of proximate cause as that which in natural and continuous sequence, unbroken by any new and independent cause, produces an event."
Was there such contributory negligence on the part of plaintiff's intestate, on the facts and circumstances of this case, that this Court should so declare as a matter of law? We think not. The question was one of fact for a jury to determine.
It is well settled that contributory negligence is plaintiff's negligent act concurring and cooperating with defendant's negligent act in producing injury. Negligence and contributory negligence do not essentially differ.Liske v. Walton, 198 N.C. 741. The burden of proving negligence is on plaintiff, that of contributory negligence is on defendant.
In Elder v. R. R., 194 N.C. 617 (619), citing authorities, is the following: "Originally, under C. S., 567, in cases calling for its application, there was some question as to whether a plea of contributory negligence (the burden of such issue being on the defendant) could be taken advantage of on a motion to nonsuit, but it is now well settled that such may be done when the contributory negligence of the plaintiff is established by his or her own evidence, as he or she thus proves himself or herself out of court."
In Hood v. Mitchell, 204 N.C. 130 (135), it is said: "It is rarely the case that the Court can hold as a matter of law, upon the allegations *Page 387 
of the complaint, or upon evidence offered by the plaintiff, that plaintiff, who has been injured by the negligence of the defendant, cannot recover damages resulting from such injuries, because by his own negligence he contributed to his injuries. It is sufficient to say that this is not such a case."
The traffic ordinance of the city of Raleigh applicable is as follows: "To slow down upon approaching each street intersection, or pedestrian in the street, so as to pass such intersection or pedestrian at a speed not exceeding ten miles per hour."
The plaintiff's intestate, as the evidence indicates, had worked at the Commercial National Bank and was there about 11:15 or 11:30 on the night of his death, and had told Yates Parker that he was going to walk home. A direction to go to reach his father's home on Tilden Street was to cross from east to west over the street intersection, where he was killed. He was at a place he had a right to be and could presume that defendant would comply with the ordinance and not cross the intersection at more than ten miles an hour.
It was a matter of common knowledge that defendant, running his automobile at the estimated speed of from thirty to forty miles per hour, defendant was traveling a distance of from 44 to 58 1/2 feet as each and every second tolled. Five seconds previous to the accident defendant's automobile was from 220 to 290 feet distant from the point of collision.
W. N. Perry testified that defendant: "Made the statement that he saw him going toward the curb — moving, running; that he ran in front ofthe car; that he suddenly saw him in front of the car; and that he tried to pull away like this (indicating). I had heard him say two or three years before that he was having some trouble with his eyes. . . . I don't recall that he told me he saw Russell Jones jump from in front of another car in front of his car."
The evidence indicated at the time of the collision there were no other cars going or coming on Hillsboro Street.
H.I. Stell testified that defendant: "Said the first time he saw Mr. Jones was when he was right in front of his headlights. I had heard about the condition of his eyes, but I did not know. He told me one of his eyes was bad. He made that statement in 1925 or 1926. . . . Q. Didn't he also say that Mr. Jones suddenly ran from his left, right immediately in front of his car? A. I don't remember his saying he ran in front. He said the first time he saw him was right in front of his headlights." The evidence was to the effect that the defendant was practically blind in his right eye.
Taking all the facts and circumstances, we think the question of contributory negligence was for the jury to determine. The plaintiff, in *Page 388 
his complaint, alleges: "Defendant negligently and unlawfully failed to keep a proper lookout for pedestrians rightfully in said street. Defendant negligently and wrongfully failed to stop his car after he saw, or by the exercise of ordinary care and prudence could have seen intestate in the act of crossing Hillsboro Street, at the intersection of West and Hillsboro streets."
In Moore v. Powell, 205 N.C. 636 (639), is the following: "In Goss v.Williams, 196 N.C. 213 (221-222), the following able charge of Judge Sinclair in the court below was sustained: `You are instructed that even though the injured party through his own negligence placed himself in a position of peril, he may recover if the one who injured him discovered, or by the exercise of ordinary care could have discovered him in time to have avoided the injury. The defendant would not be relieved of liability by reason of the fact that he did not see him, but the law holds him to the responsibility of seeing what he could have seen by keeping a reasonably vigilant and proper lookout.'"
The court below had before it the court papers and the printed record in the former action. The court below found that all court costs in the former action have been paid; and that the present action was brought within the time prescribed by C. S., 160 and 415.
In the judgment of the court below is the following: "That the evidence in the instant case is substantially the same as the evidence offered upon the trial of the first case, and it further appearing to the court, in addition thereto, and the court being of the opinion that the plaintiff ought not to recover, in any event, upon the evidence offered in the instant case. The motion of defendant is allowed." And the plaintiff was nonsuited.
We cannot hold with the able and learned judge in the court below that the evidence in this case was substantially the same as the evidence offered upon the trial of the first case, and the plaintiff ought not to recover in any event upon the evidence offered in the instant case.
In Hampton v. Spinning Co., 198 N.C. 235 (240), it is said: "If the Supreme Court affirms the judgment of the trial court, he may, under C. S., 415, bring a new action within the period therein specified. But, if upon the trial of the new action, upon its merits, in either event, it appears to the trial court, and is found by such court as a fact, that the second suit is based upon substantially identical allegation and substantially identical evidence, and that the merits of the second cause are identically the same, thereupon the trial court should hold that the judgment in the first action was a bar, or res judicata, and thus end that particular allegation."Midkiff v. Insurance Co., 198 N.C. 568; Fuquay v. R. R.,199 N.C. 499.
In the former case of Jones, Admr., v. Bagwell, 201 N.C. 831 (832), we find: "There was no direct evidence at the trial of this action *Page 389 
tending to sustain the allegations of the complaint with respect to the rate of speed at which, or in the manner in which, defendant was driving his automobile at the time plaintiff's intestate was struck and fatally injured. Plaintiff contends on his appeal to this Court that the evidence tends to show facts and circumstances from which the jury could have reasonably inferred that defendant was negligent, as alleged in the complaint. A careful consideration of all the evidence fails to sustain this contention. All the evidence shows that the unfortunate death of plaintiff's intestate was the result of an unavoidable accident, for which defendant was not responsible. There was no error in the judgment dismissing the action. It is affirmed."
There was new and material evidence as to the rate of speed which defendant was driving the car and the manner of its operation, when plaintiff's intestate was killed.
The new evidence was to the effect that shortly after midnight, 21 December, 1929, defendant, suffering the complete lack of vision in his right eye, and while driving his automobile westerly along Hillsboro Street at a speed in excess of city ordinances and State law, and in violation thereof, struck and fatally injured plaintiff's intestate. So far as plaintiff's evidence disclosed, there were no eye-witnesses to the exact instant of the collision, nor to the point of impact in the street. The nearest approach was the testimony of certain witnesses who said, substantially, that hearing "a thud sound" of noise from the direction of the intersection, they saw defendant's car "just a fraction of a second," and "within a split second," after hearing the impact, traveling from 30 to 40 miles per hour, in a westerly direction, gradually slowing down, and stopping on the north side of Hillsboro Street a distance of about 71 steps from where intestate's body was found in the switch of the north car track. That Hillsboro Street was a straight, wide-open street, without obstructions, with an arc light burning at the intersection. At the moment of impact no traffic or cars were moving in either direction, east or west; and there were no obstructions to traffic and no cars parked on the north side of the street.
It was in evidence that defendant, the first time he saw plaintiff's intestate, "he was right in front of his headlights."
Plaintiff's evidence, on the former trial uncontradicted, was to the effect that defendant stated that intestate had jumped from in front of acar going east to a place immediately in front of defendant's car; and suchallegation was the gravamen of the defense. On the present trial, however, while one witness, Neill Hester, testified that he heard defendant make that statement, he also testified that he was in position to see, but didnot see any east-bound car. Two other witnesses testified not only that defendant made no such statement to them, but that he told *Page 390 
them rather the contrary — that the first time he saw intestate was when the latter suddenly appeared in front of the headlights of his car, running toward the curb, but so close that defendant could not avoid him.
This constituted the sharp difference between the testimony offered by the plaintiff upon both trials; and was substantially new and materially different evidence, which plaintiff contended was not available on the former trial.
For the reasons given, the judgment of the court below must be
Reversed.