Civil action for recovery for alleged wrongful death. C. S., 160-161.
These facts appear to be uncontroverted: Plaintiff's intestate, Olive C. Jones, came to her death in the forenoon of 8 July, 1939, at intersection of U.S. Highway No. 421 and State Highway No. 16, at Miller's Creek, North Carolina, in a collision between a Ford sedan, owned and operated by Elijah Sexton in which he, she and four others, two men and two boys, were riding — she on the front seat with driver, and the others on rear seat, traveling southeasterly on State Highway No. 16 from the town of Jefferson toward the town of North Wilkesboro, and a motor express truck owned by defendant, C. B. Yates, operated under franchise for purpose of transporting express, traveling northwesterly on U.S. Highway No. 421, from North Wilkesboro toward the town of Boone and driven by defendant, F. M. Staley, a duly authorized and empowered agent and employee of his codefendant, acting at the time in the scope of his employment and in the furtherance of the business of his principal. As U.S. Highway No. 421, for a distance of 1,500 feet, approaches the point where State Highway No. 16 intersects with it at Miller's Creek, it runs straight on a north 47 degrees west course, veering slightly to south of that course after it passes the point of intersection. As State Highway 16 approaches the said point of intersection it runs south slightly to the east, but before reaching the intersection the road changes to a southeast course at a greater degree than the course of U.S. Highway 421 and runs straight to the intersection with the latter highway, and enters same on a slightly acute angle. As between the two highways, U.S. Highway 421 is the dominant, and State Highway 16, the subservient road. On the latter there are Stop and Junction signs, erected by State Highway Commission on the right-hand side of one traveling from the north toward the intersection.
Plaintiff in his complaint alleges that while the automobile in which his intestate was riding was being operated in a proper and lawful manner, on its right-hand side of the center line of the highway, and after it had entered and traversed this intersection of said highways, it was run into head-on by the transfer truck.
Plaintiff further alleges in substance as acts of negligence of defendants proximately causing the collision and resultant death to his intestate, that defendant Staley, agent and employee of his codefendant, unlawfully, negligently, and recklessly operated the transfer truck (a) at an excessive and unlawful rate of speed, at least sixty miles an hour, and so as to render it unmanageable; (b) to the left of the center line of the highway; (c) in a reckless and indifferent manner, without due care and circumspection, or proper regard for the lives and safety of others, *Page 576 
and so as to endanger the lives and property of others upon the highway; and (d) in failing (1) to apply the brakes thereon and to check its speed, (2) to keep a proper lookout upon approaching the intersection beyond which the collision occurred, (3) to yield the right of way to the automobile which had entered and traversed the intersection before it was run into by the truck, and (4) to yield to the automobile its right to one-half of the thirty-six feet wide hard surfaced portion of the highway.
Defendants, in their answer, deny these allegations of the complaint, and, as further defense, and by way of new matter, make substantially these averments: (1) That defendant Staley was driving the truck in question at a slow, lawful, and reasonable rate of speed, entirely upon his right-hand side of U.S. Highway 421, when Elijah Sexton, operating the car in which intestate was riding, and traveling on State Highway 16, without any warning or signal, and without stopping as required by law, or even slowing the unlawful speed of sixty-five to seventy miles per hour at which said car was moving as it approached the intersection of said highways, unlawfully, carelessly, and recklessly drove the car into the intersection directly in front, and in the path of the truck, in willful and wanton disregard of the rights and safety, and so as to endanger the person and property of others, thereby solely and proximately causing the collision. (2) That plaintiff's intestate, riding on the front seat with Elijah Sexton, in a position to see, understand, and appreciate the reckless and negligent manner in which he was operating his car, and the circumstances confronting him, was contributorily negligent in failing to warn him.
Plaintiff, in reply, denies that Elijah Sexton was negligent in any manner, as averred by defendant, but alleges that if he were negligent, such negligence only concurred with that of defendants, as alleged, in proximately causing the collision and resultant death of intestate.
Upon the trial below, plaintiff offered pertinent testimony of various witnesses, as follows: Lundy Pierce testified that, while he runs a filling station on the northeast side of U.S. Highway No. 421, he was standing on the south shoulder of the hard surface, about 40 or 50 feet from the point of the accident. He describes the occurrence in this manner: "The first thing I knew Mr. Staley blew his horn. . . . When I first saw him he was on the right-hand side of the center of the highway No. 421, leading toward Boone. When he blew his horn, I looked around, and he threw up his hand, and by that time I noticed a car coming into the intersection . . . the car Sexton was driving, coming in from 16. Staley was coming up on his side of the road and here comes the automobile on into the intersection. When they saw they were going to hit, Staley cut to the left and the car cut to the right, . . . this made them both cutting in the same direction when they *Page 577 
hit . . . at the end of the hard surface . . . partly on both sides of the center line. When they struck the truck bounced up and the car turned back around headed directly west. The truck turned sideways and bounced up and came back down . . . on the back end of the automobile and knocked the automobile up the road 75 or 80 feet from where they hit. The truck turned around. . . . It was lying across the road on the left side on the center of No. 421. . . . It may have been partly on both sides of the center. . . . Staley's truck was a mixed load of stuff, feed and grain. In my opinion he was not driving over 35 miles an hour. I saw the other car approaching the intersection, and in my opinion there wasn't much difference in the rate of speed they were driving. Both traveling about 35 miles an hour. If any difference the car . . . was running faster than the truck. . . . Both cars were badly damaged. . . . There were no cars parked in front of the filling station that would obstruct the view of a party coming from North Wilkesboro going toward West Jefferson, in either direction."
Then, on cross-examination, Pierce continued: ". . . There was a Stop sign on 16 below my filling station as you come into 421 from West Jefferson. Said sign has letters in black about seven inches high with yellow background and says STOP, and . . . was in plain view of any person driving a car from Jefferson to the intersection and there was also a sign right above and on Highway 16 just before you enter the intersection facing the driver coming from toward Jefferson with the word `JUNCTION' . . . letters . . . 7 inches . . . in plain view of any person coming from toward West Jefferson. . . . Staley blew his horn before he entered the intersection. . . . He was not looking off of the road at the time he blew his horn. . . . The track was lying on its side after the wreck. . . . I didn't hear the party driving the Sexton car blow the horn before he entered the intersection. I think I could have heard it. The Sexton car did not check up in entering the highway. . . . It didn't stop until it hit the truck. I saw the car just as it was entering the intersection . . . and just a moment before they hit. The front end of the car ran against the front side of the truck and the truck careened around. . . . There is a section of the intersection that is not paved. There is nothing to obstruct the view of the sign `JUNCTION,' or signboard, of a car driven from West Jefferson into the . . . intersection. . . . There is nothing to prevent a driver of such car from seeing a car coming from toward North Wilkesboro. You could see about 1,200 or 1,500 feet from toward North Wilkesboro to the intersection.
Robert Byers, testifying, said: "I was standing east of the intersection. . . . Lundy Pierce . . . and I were standing about five *Page 578 
or six feet apart. I saw the truck coming. . . . He was making between 30 and 35 miles an hour. I did not see the car coming into the intersection. I didn't see it until after the wreck occurred. I saw the signs where the cars hit. They were about the middle of the road. . . . When I first saw the truck it was coming on its right-hand side of the main thoroughfare, No. 421. . . . On the Jefferson road beyond the intersection there is a big yellow sign with black letters saying `STOP,' . . . a little closer to the intersection there was a sign on the right side saying `JUNCTION.' The signs were there the day the wreck occurred. The last time I saw the truck before I heard the collision it was on the right of the center of the National Highway coming . . . to Boone . . . I saw some marks on the road where the cars ran together. They were about the center of Highway No. 421, a little more of them on the left-hand side."
Carlyle Ingle, State Highway Patrolman, who arrived on the scene after the collision, observed marks on the road. He testified: "They started near the end of the concrete on No. 421. . . . The first scratch marks appeared near the center of the road, looking like at the point of impact . . . and led to the left to the truck. . . . From the appearance of the car, it had a definite collision with something on the left-hand side of its front. . . . There was a Stop sign before reaching the intersection on Highway No. 16, which comes from Jefferson, erected by the State Highway Commission. It was plainly visible. . . . U.S. 421 was the dominant road. There is no rule of the road or regulation requiring a man on 421 to stop there. There was a requirement that one coming along No. 16 should stop before entering the intersection. The front wheels of the truck were damaged. . . . The best I remember the right front one was knocked back and the axle bent and the spring broken. The front end of the truck and the left front end of the car were damaged. As the truck spun around the side of it hit the back of the car."
R. C. Davis testified: "I was in the car . . . Elijah Sexton was driving . . . to Winston-Salem. . . . Mrs. Jones was in the car. . . . I know that she was riding . . . as a guest. I had been over the road one time before the wreck happened. We were going into the intersection . . . and were making probably 35 miles per hour. We had already gotten across the center of the road making the turn to go into Wilkesboro. We heard the truck blow. Of course it was done right now; we was over the mark, over the center of the highway when the truck hit us. . . . We were on the right-hand side of the center of the highway going into Wilkesboro when it happened. We were making the turn to go into North Wilkesboro when the truck hit us. . . . When the truck struck us it was going anywhere *Page 579 
from 45 to 50 miles an hour. . . . I remember seeing a small sign up on the bank while approaching the intersection. I couldn't say whether Mr. Sexton, who was driving the car, slacked his speed any when he came into the intersection. . . . He was going around 35 miles an hour. He didn't stop before entering the intersection." Then, on cross-examination, the witness continued: "The sign I was telling . . . about is on the road coming in from Jefferson . . . on the right side, setting up on the bank. On the sign are letters in black saying `STOP.' The sign was not in plain view of a person driving from No. 16 into the intersection. It was grown up in weeds and set up on the bank. I did not see it plain. I was along there about ten days before that and it was there then. There was a sign in plain view of a person driving in from Jefferson saying `JUNCTION.'
"I was riding in the back seat in the middle. My father was on my left and the two little boys on the right . . . four people in the back seat. The woman who was killed was riding in the front seat . . . on the side next to the Stop sign and . . . the Junction sign, . . . right-hand side going toward North Wilkesboro. . . . There was nothing to obstruct the view of the driver from the junction sign before entering the highway. When I first saw the truck it was right close to us and I heard the horn blow. If was probably 30 or 40 feet away. I don't know where it was traveling when I first saw it, but it was over on the left-hand side when it hit us. I cannot say for sure just where the truck was when I first saw it because it was done so quickly. I wouldn't say that the truck wasn't on its right side of the road when I first saw it."
Elijah Sexton, by deposition, testified: "I owned the 1937 Ford two-door sedan . . . car I was driving. . . . Just prior to the time I entered the intersection I cannot say just how fast I was driving, but I had never driven over 40 miles an hour that morning. I do not know whether I slowed down any in approaching the intersection. I cannot recall anything about whether I slowed down or blew my horn. I recall seeing a sign below the intersection but I don't know what kind of sign it was. I could not discover what was on the sign. I don't remember whether I stopped prior to entering the intersection. The wreck happened at the intersection or close to it. I do not recall who I had the wreck with. I don't remember whether it was a truck or automobile. . . . I never did see it, but they said it was a truck. I don't remember seeing it. You could see down the highway toward North Wilkesboro quite a distance. I had never been over the road before. I did not know there was an intersection there. I do not know how fast I was going at the time I entered it. I do not recall blowing my horn. At the time of the collision I was knocked unconscious. That is all I *Page 580 
can say. . . . I do not remember anyone in the car making a remark about entering the intersection or asking me to slow down. I do not remember any of the parties warning me about the intersection or to slow down, or making any sign of alarm. . . . The truck was coming from Wilkesboro. I was going toward Wilkesboro."
On cross-examination, Sexton further testified: "The brakes and general state of repair of my car was good. . . . She (Mrs. Jones) was riding in my car as a guest. She had no control or management whatsoever over my automobile. . . . I was not drinking. . . . I had been driving my car at a lawful rate of speed and in a careful manner up to the time the collision occurred. I saw a sign at or near the intersection but I couldn't read it because bushes were grown up around it. . . . The cars were traveling in opposite directions and meeting each other when they ran together. . . . The surface of the road was dry and the day clear. . . . If there was a Stop sign at the intersection the fellow on the Boone Highway had the right of way."
Defendants, reserving exception to denial of their motion for judgment as in case of nonsuit, offered testimony of Fred M. Staley and Weldon McCoy. Staley gave this narrative: "On July 8, 1939, . . . I was going to Boone, traveling west . . . on National Highway No. 421. I know where the State road from Jefferson intersects with No. 421 near Miller's Creek. The wreck was just beyond the center of the intersection. I was operating my car on the right-hand side of U.S. 421 when it occurred. The Ford car came out of the mouth of No. 16, with which road I am familiar. Northwest of the intersection on the right side of No. 16 there was a Stop sign and also a Junction sign. . . . Immediately prior to the impact my truck was on the right of the center line of the hard surfaced portion of the highway. I was driving 20 or 25 miles an hour. In my opinion the car driven by Mr. Sexton was traveling between 50 and 60 miles an hour. The right front headlight and fender and wheel of my truck were stricken. The left front fender and headlight of Mr. Sexton's car came in contact with my truck. When the automobiles collided they both turned southwestwardly and the truck turned on west of No. 421 and came to rest on its side due south of the intersection. The Ford stopped . . . on its right side. My truck entered the intersection first. I had taken my foot off the gas and put it on the brake immediately before entering the intersection. When I saw he was coming on in I hit the brakes immediately. I mean by hitting the brakes, I pumped the brakes . . . hydraulic brakes. I had them on hard enough by the time the crash occurred. Mr. Sexton . . . did not sound his horn or do anything or slow down the speed of the automobile before entering the *Page 581 
intersection. My truck was in plain view when he came up to the intersection for several hundred feet. You can see from 300 to 450 feet from where 16 enters the intersection. . . . My truck had never been on my left of the center line of the highway before the cars came together."
Weldon McCoy testified: "I was staying at Myers Filling Station which is right in Miller's Creek on left side of the National Highway going to Boone. At the time of the wreck I was standing on the side of the road the filling station is on and up next to Wilkesboro. I saw Fred Staley operating his truck. . . . Immediately before the wreck his truck was on his right side. I saw the wreck. I saw the car driven by Elijah Sexton; it was coming out of 16 from West Jefferson. No. 16 does not cross No. 421, it enters it. At time of the wreck there was a sign on No. 16 down some distance from the intersection with the word `STOP' on it. There was also a junction sign before you come into the intersection. I saw the car driven by Sexton before it entered the intersection. It did not stop or slow its speed from the sign until it entered the intersection. . . . In my opinion the Sexton car was traveling 55 or 60 miles an hour. The truck was making 25 or 30 miles an hour before it entered, before he put on the brakes. The truck driver put on his brakes and had just about stopped when the car and truck hit. The left-hand fender and light on the car struck the right-hand side of the truck. When the car came into the intersection he tried to turn . . . to the right. It looked like he tried to beat the truck out and go around and when he turned to the right his left-hand fender struck and that turned the car to the right. . . . I said the car was on its right side of the road and the truck on its right side when the car hit the truck. The cars came together on the right-hand side going toward Boone."
From judgment as in case of nonsuit at close of all the evidence, plaintiff appeals to Supreme Court and assigns error.
When the evidence is considered in the light most favorable to plaintiff, we are of opinion that the case comes within the principles enunciated in Smith v. Sink, 211 N.C. 725, 192 S.E. 108; Powers v.Sternberg, 213 N.C. 41, 195 S.E. 88; and Butner v. Spease, 217 N.C. 82,6 S.E.2d 808, and is insufficient to require that an issue of negligence be submitted to the jury. It is manifest that Elijah Sexton was negligent and that his negligence insulated negligence, if any, *Page 582 
of defendants, and was the sole proximate cause of the collision. This conclusion finds support in Harton v. Telephone Co., 146 N.C. 429,59 S.E. 1022; Lineberry v. R. R., 187 N.C. 786, 123 S.E. 1; Thompson v. R.R., 195 N.C. 663, 143 S.E. 186; Craver v. Cotton Mills, 196 N.C. 330,145 S.E. 570; Boyd v. R. R., 200 N.C. 324, 156 S.E. 507; Hinnant v.R. R., 202 N.C. 489, 163 S.E. 555; Baker v. R. R., 205 N.C. 329,171 S.E. 342; Newell v. Darnell, 209 N.C. 254, 183 S.E. 374; Smith v.Sink, supra; Murray v. R. R., 218 N.C. 392, 11 S.E.2d 326.
In an action for recovery of damages for wrongful death, resulting from alleged actionable negligence, the plaintiff must show: First, that there has been a failure on the part of defendant to exercise proper care in the performance of some legal duty which the defendant owed plaintiff's intestate under the circumstances in which they were placed; and second, that such negligent breach of duty was the proximate cause of the injury which produced the death — a cause that produced the result in continuous sequence, and without which it would not have occurred, and one from which any man of ordinary prudence would have foreseen that such result was probable under all the facts as they existed. Whitt v. Rand,187 N.C. 805, 123 S.E. 84; Murray v. R. R., supra; Mills v. Moore,219 N.C. 25, 12 S.E.2d 661; White v. Chappell, 219 N.C. 652,14 S.E.2d 843, and cases cited.
The principle prevails in this State that what is negligence is a question of law, and when the facts are admitted or established, the court must say whether it does or does not exist. "This rule extends and applies not only to the question of negligent breach of duty, but also to the feature of proximate cause." Hoke, J., in Hicks v. Mfg. Co., 138 N.C. 319,50 S.E. 703; Russell v. R. R., 118 N.C. 1098, 24 S.E. 512;Clinard v. Electric Co., 192 N.C. 736, 136 S.E. 1; Murray v. R. R.,supra.
In Lineberry v. R. R., supra, Clarkson, J., said: "It is well settled that where the facts are all admitted, and only one inference may be drawn from them, the Court will declare whether an act was the proximate cause of the injury or not." Again in Russell v. R. R., supra, it is stated that "Where the facts are undisputed and but a single inference can be drawn from them, it is the exclusive duty of the court to determine whether an injury has been caused by the negligence of one or the concurrent negligence of both of the parties."
Furthermore, it is proper in negligence cases to sustain a demurrer to the evidence and enter judgment as of nonsuit, "1. When all the evidence taken in the light most favorable to the plaintiff, fails to show any actionable negligence on the part of the defendant . . . 2. When it clearly appears from the evidence that the injury complained of was *Page 583 
independently and proximately produced by the wrongful act, neglect, or default of an outside agency or responsible third person . . .," Smith v.Sink, supra, and cases cited. See, also, Boyd v. R. R., supra; Powers v.Sternberg, supra; Butner v. Spease, supra; Murray v. R. R., supra.
"Foreseeability is the test of whether the intervening act is such a new, independent and efficient cause as to insulate the original negligent act. That is to say, if the original wrongdoer could reasonably foresee the intervening act and resultant injury, that the sequence of events is not broken by a new and independent cause, and in such event the original wrongdoer remains liable," Brogden, J., in Hinnant v. R. R., supra. Hartonv. Telephone Co., supra; Herman v. R. R., 197 N.C. 718, 150 S.E. 361;Beach v. Patton, 208 N.C. 134, 179 S.E. 446; Butner v. Spease, supra;Murray v. R. R., supra.
Too, it is a general rule of law, even in the absence of statutory requirements, that the operator of a motor vehicle must exercise ordinary care, that is, that degree of care which an ordinarily prudent person would exercise under similar circumstances. In the exercise of such duty it is incumbent upon the operator of a motor vehicle to keep same under control, and to keep a reasonably careful lookout, so as to avoid collision with persons and vehicles upon the highways. 5 Am. Jur., Automobiles, sections 165, 166, 167.
However, a motorist is not under a duty of anticipating negligence on the part of others, but in the absence of anything which gives or should give notice to the contrary, a person is entitled to assume, and to act on the assumption, that others will exercise ordinary care for their own safety. 45 C. J., 705; Shirley v. Ayers, 201 N.C. 51, 158 S.E. 840. See, also, Cory v. Cory, 205 N.C. 205, 170 S.E. 629; Jones v. Bagwell, 207 N.C. 378, 177 S.E. 170; Hancock v. Wilson, 211 N.C. 129,189 S.E. 631; Sebastian v. Motor Lines, 213 N.C. 770, 197 S.E. 539; Guthriev. Gocking, 214 N.C. 513, 199 S.E. 707; Butner v. Spease, supra.
Furthermore, it is provided by chapter 407, Public Laws 1937, section 120, that the State Highway Commission, with reference to State Highways, is authorized to designate main traveled or through highways by erecting at the entrance thereto from intersecting highways signs notifying drivers of vehicles to come to full stop before entering or crossing such designated highway, "and whenever any such signs have been so erected it shall be unlawful for the driver of any vehicle to fail to stop in obedience thereto. That no failure so to stop, however, shall be considered contributory negligence per se in any action at law for injury to person or property; but the facts relating to such failure to stop may be considered with the other facts in the case in determining whether the plaintiff in such action was guilty of contributory negligence." *Page 584 
In Sebastian v. Motor Lines, supra, regarding the statute, it is held, "as a necessary corollary or as the rationale of the statute," that where the party charged is a defendant in any such action the failure so to stop is not to be considered negligence per se, but only evidence thereof to be considered with other facts in the case in determining whether the defendant in such action is guilty of negligence." In like manner and for the same reason, the principle may be extended to anyone who violates the statute.
It is provided in section 103 of chapter 407 of Public Laws 1937, that no person shall drive a vehicle on a highway at a speed greater than is reasonable and prudent under the conditions then existing; that where no special hazard exists a speed of thirty-five miles per hour for motor vehicles designed, equipped for, or engaged in transporting property shall be lawful; but any speed in excess of that limit shall be prima facie
evidence that the speed is not reasonable or prudent and that it is unlawful; but that the provisions of the section shall not be construed to relieve the plaintiff in any civil action from the burden of proving negligence upon the part of the defendant as the proximate cause of an accident.
Applying these principles to the evidence in the case in hand, it was unlawful for Elijah Sexton, the driver of the Ford sedan in which plaintiff's intestate was riding, to fail to stop, in obedience to the stop sign, erected by the State Highway Commission on State Highway No. 16, before attempting to enter U.S. Highway No. 421, the dominant highway, and his failure so to do is evidence of negligence to be considered with other facts in the case in determining whether he was guilty of negligence. When so considered the evidence of his conduct makes him guilty of negligence as a matter of law. While the "Stop" and "Junction" signs, as testified to by other witnesses for plaintiff, were "in plain view" of, or "plainly visible" to any person traveling on Highway No. 16 toward the entrance into Highway No. 421, and while another, R. C. Davis, riding in the Ford sedan with Sexton, saw those signs, and saw the black letters "Stop," and while a sign was seen by Sexton, he admits that he approached the point of the wreck without being able to recall that he slackened his speed, which he recalled had not been over forty miles per hour that morning, and wrecked his car in collision with the truck without seeing the truck, when there was nothing to prevent him from seeing it. All the evidence for plaintiff, as well as for the defendant, shows that, in approaching the point where Highway No. 16 enters Highway No. 421, there was nothing to obstruct the truck from Sexton's view. Yet, he admits that he "never did see" the truck and does not know whether he struck a truck or an automobile. Further, the evidence shows that every appearance indicates that Sexton was running *Page 585 
his Ford into a zone of danger which he should have seen and which others, similarly situated, did see, if he did not, and that he failed to see the obvious. Such negligence, if the sole proximate cause of injury or death, will bar recovery, and this extends even to a guest. Powers v. Sternberg,supra, and Miller v. R. R., ante, 562.
The defendant Staley, who was acquainted with the conditions on State Highway No. 16, but operating the truck upon the dominant highway, was under no duty to anticipate that Sexton, in approaching the intersection, the truck being in plain view, would fail to stop as required by the statute; and in the absence of anything which gave or should give notice to the contrary, he was entitled to assume and to act on the assumption, even to the last moment, that Sexton would not only exercise ordinary care for his own safety as well as those riding in his car, but would act in obedience to the statute, and stop before entering the dominant highway. The evidence points to the emergency caused by the failure of Sexton to stop. Such a situation was not reasonably foreseeable by Staley. All the evidence further shows that Staley was operating the truck on his right-hand side of the dominant highway immediately before the collision.
It is contended by the plaintiff, however, that there is evidence tending to show that the speed of the truck was in excess of thirty-five miles an hour, and, therefore, prima facie unlawful. Even so, it is manifest from the evidence that its speed would have resulted in no injury but for the negligent act of Sexton. Hence, the proximate cause of the collision must be attributed to the gross and palpable negligence of Sexton, as in Butner v. Spease, supra.
The judgment below is
Affirmed.