ANNIE W. HUDSON v. PETROLEUM TRANSIT COMPANY, INC., CHARLES THOMAS MINTON AND CLAUDE HUDSON MILLER.

(Filed 12 June, 1959.)

**1. Automobiles § 17—**

Where the evidence discloses that electric traffic control signals were maintained at the intersection within a municipality but no ordinance of the municipality in regard thereto is introduced in evidence, G.S. 20-158(c) is not applicable, and the rights of way of motorists at such intersection must be determined upon the basis of the well-recognized meaning of such signal lights, and motorists will be required to give that obedience to them which a reasonably prudent operator would give.

**2. Automobiles § 8—**

A vehicle turning left at an intersection is required to approach the intersection in his lane of travel nearest the center of the highway and pass as closely as practicable to the right of the center of the intersection. G.S. 20-153(a).

**3. Automobiles § 17—**

The driver of a vehicle desiring to turn left at an intersection of highways controlled by traffic control signals is entitled to move into the intersection when the traffic signal facing him is green, but, before turning left across the lanes of travel of vehicles headed in the opposite direction, is under duty to yield them the right of way. G. S. 20-155.

**4. Same—**

A motorist approaching an intersection controlled by traffic lights is entitled to proceed straight across the intersection when faced by the green signal, and, in the absence of anything which gives or should give him notice to the contrary, is not under duty to anticipate that a motorist approaching along the intersecting highway from his left will fail to yield the right of way as required by statute. G.S. 20-155.

**5. Automobiles § 38—**

Testimony of a witness that a vehicle was traveling some 65 m.p.h. is without probative value when it is made to appear that the witness' estimate of speed was based solely upon seeing the lights of such vehicle as it approached her from the opposite direction at night time.

**6. Negligence § 19a—**

What is negligence is a question of law, and when the facts are admitted or established it is for the Court to determine whether negligence exists or not, and if so whether it is a proximate cause.

**7. Negligence § 19b(1)—**

When all the evidence, considered in the light most favorable to plaintiff, fails to show actionable negligence on the part of defendant, or clearly establishes that the injury was independently and proximately produced by the wrongful act, neglect, or default of an outside agency or responsible third person, nonsuit is proper.

**8. Automobiles § 41g— Negligence of driver turning left at intersection across lanes of travel of vehicles having green light held sole proximate cause of collision.**

The evidence tended to show that plaintiff was a passenger in an automobile traveling west on a four-lane highway, that as the vehicle approached an intersection controlled by traffic lights the traffic light facing the driver turned green, that the driver entered the intersection and turned left in front of two cars standing in the northern lane for eastbound traffic, and continued on across the southern lane for eastbound traffic where the car was struck by a tractor-trailer traveling east in the southern lane. *Held:* Even conceding that the tractor-trailer was traveling at an excessive speed, the driver thereof entered the intersection with the green light and was not under duty to anticipate that another vehicle would cross his lane of travel from his left, and therefore the motion for involuntary nonsuit of the driver and owner of the tractor-trailer was properly allowed, since the evidence discloses that the collision was independently and proximately caused by the negligence of the driver of the car.

APPEAL by plaintiff from *Oliver, J.,* at October-November 1958 Mixed Term of UNION.

Civil action to recover damages for personal injury sustained about 9:20 P. M., on 22 June, 1957, in a collision between a 1956 International tractor-trailer truck, owned by defendant Petroleum Transit Company, incorporated, (hereinafter referred to as Transit Company) and operated by defendant Charles Thomas Minton (hereinafter referred to as Minton) as its agent, servant and employee in and about its business, and a 1950 Ford two-door automobile owned and operated by defendant Claude Hudson Miller, (hereinafter referred to as Miller), and in which plaintiff was a passenger, at the intersection of U. S. Highway #74, also known as Roosevelt Boulevard, and N. C. Highway #200, also known as Morgan Mill Road, in the town of Monroe, North Carolina. This factual situation is not controverted.

The record of case on appeal shows the following admissions in the pleadings:

Highway #74 runs in an easterly-westerly direction. It has four paved lanes, two eastbound approximately twenty-four feet wide, and two westbound approximately twenty-four feet wide, the two eastbound and the two westbound being separated by a grass plot thirty feet wide. And Highway #200 runs in northerly-southerly direction, with paved surface approximately twenty-four feet wide. The two highways intersect at right angles. There are traffic signals at the intersection; one signal light facing west on the eastbound traffic lane of U. S. Highway #74, suspended straight above the center of said dual lanes, and one signal light facing east on westbound traffic lanes of said highway, suspended straight above the center of said dual

lanes, and on Highway #200 one traffic light facing north and sus-
pended straight above and over the south edge of the dual westbound
traffic lanes of U. S. Highway #74, and one facing south and suspended
straight above and over Highway #200 on the north edge of the dual
lanes of eastbound traffic lanes on Highway #74. The traffic signal
lights, at the time of said collision, were operating in perfect order.
The light on the eastbound traffic on Highway #74 and the light on
the westbound traffic on Highway #74 operate simultaneously, that is,
when the light on one was red, the light on the other was red, and
when the light on one was green, the light on the other was green;
and the traffic lights facing north and south on Highway #200 work
simultaneously,— both being red at the same time, and both being
green at the same time. And these lights facing on Highway #200 work
simultaneously with the two lights facing the traffic on Highway #74,
that is, when the lights facing the traffic on Highway #74 were green,
the lights facing the traffic on Highway #200 were red, and when the
lights facing Highway #74 were red, the lights facing the traffic on
Highway #200 were green.

And the record on appeal shows that plaintiff alleges in paragraph
9 of her complaint that at the time and place of the collision the de-
fendant Minton was operating the said tractor-trailer truck for his
employer, Transit Company, Inc., in an easterly direction along High-
way #74, and as said truck came near the said intersection, the traffic
signal light facing him was red, and that there were two motor ve-
hicles that had stopped in the left lane of the eastbound traffic for
said red light signal; that as said defendant Minton came within
about 150 feet of said intersection, he released the accelerator and
let the truck roll to within about 75 feet of the said traffic light over
said intersection; and when the traffic light changed to green or "Go",
the said defendant Minton immediately accelerated the speed of said
truck and drove in the right lane of the eastbound traffic, and passed
the said two waiting motor vehicles at a fast, unlawful and reckless
rate of speed at above 65 miles per hour, and ran into the right side
of the 1950 Ford two-door automobile operated by defendant Miller,
and causing the resulting wreck, and damage to plaintiff, as herein-
after more fully set out. (This the defendants Transit Company and
Minton deny).

And the record on appeal shows that plaintiff alleges in paragraph
10 of her complaint that defendant Miller at the time and place re-
ferred to was operating his said automobile, in which plaintiff was a
passenger, in a westerly direction on Highway #74, in the left lane
of said traffic, and as he came near the said intersection the traffic

signal, which had been red changed to green or "Go"; that the said defendant Miller, without bringing his said automobile to a stop, turned it to his left and across the eastbound traffic on Highway #74, and drove across in front of the two automobiles that had stopped on the left lane of Highway #74, heading in an easterly direction, as aforesaid, and drove his said Ford automobile straight across the right traffic lane heading east on Highway #74 directly in the lane of traffic occupied by his co-defendant's tractor-trailer truck, causing the wreck and injuring plaintiff as therein more fully set out. (Defendants Transit Company and Minton admit the allegations of this paragraph).

The record on appeal further shows that plaintiff alleges in paragraph 11 of her complaint that defendants Transit Company and Minton were negligent in substantially these ways: That the truck of Transit Company was being operated at a fast, reckless and dangerous manner at an unlawful rate of speed of 65 miles per hour, so as to endanger other persons and property upon the highway, and at a greater speed than was reasonable and prudent under the conditions and circumstances then and there existing, into the intersection at a time when the intersection was occupied by another vehicle, the said Ford automobile in which plaintiff was a passenger, and when it, the Ford, had passed almost completely through the intersection before the truck entered the intersection. And that the operator of the truck failed to keep it under control, and failed to keep a proper lookout and observe the Ford automobile in the intersection in front of him, and failed to apply his brakes, and slow the speed of the truck, but rather drove the truck with tremendous speed into the side of the Ford— driving it sideways a considerable distance down the highway before ramming it into the curbing of the street * * * all of which negligence on the part of defendants Minton and Transit Company was "the sole and proximate cause, or one of the proximate causes of the injuries suffered by plaintiff." This the defendants Minton and Transit Company say is untrue and is denied.

The record further shows that plaintiff, in paragraph 12 of the complaint, alleges that defendant Miller was negligent in said collision in these ways:

"(a) He drove his said automobile into said intersection and to his left at a speed of approximately 15 miles per hour, when he saw or should have seen that said left turn could not be made in safety.

"(b) That he entered said intersection * * * without first ascertaining that the said crossing could be made through said intersection in safety.

HUDSON v. TRANSIT CO.

"(c) That he failed to apply his brakes, sound his horn, or keep his said automobile under control, as the law required him to do.

"(d) That he failed to use the care, caution and circumspection that a person of ordinary reason and prudence would have used under the conditions and circumstances then and there existing.

"And that said negligence on the part of the defendant * * * Miller was one of the proximate causes of the injuries suffered by the plaintiff, as hereinafter more fully set out * * * ."

Upon the trial in Superior Court plaintiff offered evidence in pertinent part substantially as follows: Parts of the pleadings admitted by defendants Transit Company, Inc., and Minton.

J. C. Wicker, a policeman of the city of Monroe, introduced by plaintiff testified: "I investigated * * * a collision at the intersection of U. S. Highway 74 and N. C. Highway 200 on June 22, 1957. I have made a diagram of this intersection * * * I got there to the scene of the collision at approximately 9:25 P. M. The two vehicles are numbered 1 and 2 * * * #1 is the one that the Transit Company owned * * * vehicle #1 was headed east on U. S. Highway 74. I saw the 1950 Ford in which the plaintiff was riding when I reached the scene of the collision. It was east of the intersection of #200 and the front end, the front wheels, were up on the curb * * * about 6 or 8 inches high. Part of the bumper of the tractor was embedded into the right side of the * * * Ford, I'd say a third of the way up in it * * * I mean * * * into this vehicle #2. The front seat was completely torn loose * * * and this vehicle #1, the bumper was pushed back against the left front wheel.

"I got the skid marks of the tractor-trailer. There was 56 feet skid marks of the tractor-trailer. I believe there was (were) 14 feet skid marks before the collision and 42 feet after the collision. I did not see any tire marks or skid marks leading to the 1950 Ford. There was debris or something on the highway there in that vicinity of where the wreck occurred. It was approximately 42 feet back from where #2 came to rest. The kind of debris I found was dirt and glass. All the glass on the right side of the * * * Ford was broken. I measured the distance from the left lane of traffic heading west to the point where I found the debris in the highway. It was 56 feet. I measured from the line of the intersection, the curb line, on the eastbound traffic lane in which the truck was traveling to the point where I found the debris. That's 26 feet from the curb line of N. C. #200 to the debris. N. C. #200 is 24 feet wide right at that point. It was 26 feet from the extension of the curb line to automobile. I misunderstood your question. From the west line of the intersection on the eastbound lanes

of #74 to the point where I found the debris on the street is 8 feet and 8 inches."

Then on cross-examination this witness testified in pertinent part: "I saw the plaintiff Annie Hudson * * * at the scene. I helped load her in the ambulance. I wouldn't swear who was drinking; my opinion they all were. There was a terrible odor of alcohol on all of them. There was a strong odor of whiskey in the 1950 Ford, odor of some alcoholic beverage. All of the marks, tracks and debris that I saw at the intersection or near it, and near the * * * Miller * * * Ford and the tractor-trailer unit of * * * Transit Company, were in the right-hand eastbound lane of traffic on Roosevelt Boulevard (#74). * * * The rear wheels of the tractor-trailer would be about two or three feet, something like that, from the intersecting west line of Morgan Mill Road, or #200, in my opinion * * * At the time of this collision there was a signal control light on Roosevelt Boulevard in each lane, controlling east and westbound traffic. There was also a signal control light on each side of #200 or the Boulevard, controlling traffic on #200 crossing the Boulevard * * * on vehicle #2 * * * there wasn't any lights on it when I arrived there, but the lights on the tractor-trailer were still burning.

"At the southeast corner of the intersection there is an Amoco filling station. At the northwest corner * * * is a Gulf service station, and on up the highway some 300 feet * * * on the westbound lane, there is an Esso filling station. Except for those filling stations located there at that time, that territory all the way through the town is practically uninhabited. It is country there. At the time of this collision the Highway Department had erected traffic speed signs out there. The traffic speed sign erected approaching and in this vicinity controlling traffic, going both ways, was Automobiles 55 and Trucks 45."

Then plaintiff, as witness for herself, testified in pertinent part as follows: " * * * On the night of June 22, 1957, I was riding in an automobile at the time of this collision. Claude Robinson, that's what they called him, was operating that automobile. I guess that's his name, I don't know much about him. The car had two seats in it. I was * * * in the front seat on the right * * * We were heading west as we came to the intersection of Highway #74 and N. C. Highway #200 * * * We turned around at the filling station * * * We were on the right side coming back on the side the cafe is on, at the Boulevard. I don't know much about that road, the 'second time I been on there since I been living'. I was on the far side of the road coming back. We were over close to the grass part where we made

our turn. There was (were) two cars in the intersection * * * as we came toward the intersection, the control sign light was red, before we got to it. And when we got right up to it, and it come on green, and we stopped, and then it come on red, and I looked down the road and I says 'Claude, there come(s) a car' * * * When we made our turn, we were heading toward Monroe, coming on home. That would be to our left. When we made our turn, I seen a truck in the eastbound traffic, the lanes that we were going to cross. It didn't look like no truck when I first saw it. I could see the lights going like that (indicating) and the next thing I seen, it was some kind of truck, and I said, 'There come(s) a truck or something,' and Claude said 'We got the green light' * * * Before I saw the truck close to the intersection, I seen two cars in that lane in the intersection. Those cars were standing * * * They were heading east * * * They was in the grass plot, all I could tell. It was night and you know I won't paying any attention; I don't know, now. Then I saw lights of a vehicle coming. At the time we entered the intersection and turned to our left, those lights of that vehicle would be about as far as from here to the bank or a little further across here when I seen it. I don't know how far that would be. The lights on the coming vehicle I saw, bouncing up and down, were in the inside lane, I guess that's what you call it. These two cars I saw parked there were in the first lane over here. Wasn't in the lane over there. The lights were coming down this way * * * from Charlotte. In this lane on this side here, the left lane. I don't drive a car, and I don't know. We made our turn to come out, and when we made our turn to come out, this truck was getting closer and closer to us, and I said 'That truck's getting too close right there', and when we pulled up a little further that truck just moved in on me right here and my leg was at the door. I would say that from the time I seen it till it got to where I was, that truck was traveling around 65 to 75 miles per hour, because I couldn't see nothing but the lights when I saw it."

Then on cross-examination plaintiff testified in pertinent part: "Claude was married to my cousin and him and her was in the car * * * I told him to take me to get my uniforms, and when we got over there, Miss Mattie was getting out of her car, her and her daughter-in-law and two men, and I went in the house * * * When I come back, they had got in the car where me and Claude had come there in * * * and Claude pulled down to bring me home. That's why we turned around * * * I did not get so drunk I didn't know where I went * * * I had low blood and Dr. ........ told me to drink homebrew, and I drink it * * * I had one glass * * * I don't know

anything about no Miller. I just don't know whether Claude was a fast driver. He was not driving fast when the wreck was. I told him 'That truck's coming up the road; stop' and he say he had the green light, let him go. I never told him to slow down in my life, no, sir."

Hoyle Penegar, also a witness for plaintiff, testified in pertinent part as follows: "I was close to the vicinity of this wreck on the night of June 22, 1957, when it occurred. I was at the Shell Service Station on the right * * * in the southwest corner of the intersection * * * by which the truck passed before it had the wreck. I observed the truck coming down the road, as it come by the drive-in there. I did not notice any cars in the left lane. I did not observe any cars near the intersection before the truck got there.

"I saw the truck coming up on the right side. He was going at a pretty good rate of speed, about 45, when he come around the drive-in there, and he started slowing down, and the stop light turned to 'Go' and he increased his speed and went on through and there was a crash. He was about two car lengths from the intersection when the light turned green. I did not see the other car, the Miller car, before the collision. The collision occurred in the middle of the intersection. The truck was going in the right lane."

Then on cross-examination this witness concluded as follows: "I did not observe any cars on the left-hand traffic heading east. The filling station we're talking about sits back about 150 feet from Winchester Ave. and from the Boulevard. The driveway I'm talking about is about 250 feet from the intersection. I just happened to look down that way and saw this tractor-trailer equipment coming up the hill. Then I turned and looked and saw the light turn green giving him the go ahead. At the most, he would be 100 feet from the intersection when the light turned to green. I never did see the car operated by Claude Hudson Miller that was in the collision until the collision. I did not see it turn from the westbound lane into the right bound lane. I couldn't see the car, because of the truck * * * blocking my view. The truck was between me and the car, if it come across there."

The plaintiff rested.

Then motion of defendants Transit Company, Inc., and Minton for judgment as of nonsuit was allowed, and from judgment in accordance therewith plaintiff excepted, and appealed to Supreme Court and assigns error.

*Coble Funderburk for plaintiff, appellant.*

*E. Osborne Ayscue for defendants Transit Company and Minton, appellees.*

WINBORNE, C. J. As stated in brief of plaintiff appellant the only question involved on this appeal is whether or not the judge holding the court committed error by granting the defendants' motion for judgment as of nonsuit at the end of the plaintiff's evidence.

In this connection this Court held in *Williams v. Funeral Home,* 248, N.C. 524, 103 S.E. 2d 714, in opinion by *Rodman, J.,* that: "Where a collision occurs at an intersection controlled by a traffic light within a municipality so that G.S. 20-158 (c) is inapplicable, and the municipal ordinance is not introduced in evidence, the rights of the parties will be determined upon the basis that motorists must give the lights their well-recognized meaning and give that obedience to them which a reasonably prudent operator would give." Such is the situation in the case in hand. The collision here involved occurred at an intersection controlled by traffic lights within the town of Monroe so that the provisions of G.S. 20-158 (c) are inapplicable and the municipal ordinance is not introduced in evidence. Therefore the rights of the parties will be determined upon the basis that motorists must give the lights their well-recognized meaning and give that obedience to them which a reasonably prudent operator would give.

Bearing in mind the location of the signal lights as hereinabove described in detail, the operator of the Ford automobile traveling west, desiring to turn left when he came to the red light, at the intersection of the two highways, was permitted to do so, when the traffic light changed to green, but in that event he was required (1) to approach such intersection in the lane for the traffic to the right of and nearest to the center of Highway #74, and (2) in turning to pass beyond the center of the intersection,— passing as closely as practicable to the right thereof before turning such vehicle to the left. G.S. 20-153 (a). *Simmons v. Rogers,* 247 N.C. 340, 100 S.E. 2d 849. Then his vehicle, the Ford, was in no-man's land of the light area, so to speak, subject to control of no signal light, but charged with the duty to yield the right of way to vehicles moving in eastbound traffic on Highway #74— that is, traffic approaching the intersection from his right at approximately the same time. G.S. 20-155.

Then what is the duty of the operator of the truck of defendant Transit Company, driven by defendant Minton, moving in eastbound traffic on the south lane of such traffic, with respect to the duty of the operator of the Ford automobile? It seems clear that he would be privileged to move forward only when facing a green light over his lane. And upon the signal turning green, he was warranted in entering the intersection and, in the absence of anything which gives or

should give him notice to the contrary, he was not under duty to anticipate that a motorist approaching along the intersecting highway from the left would fail to yield the right of way as required by G.S. 20-155. *Hyder v. Battery Co.,* 242 N.C. 553, 89 S.E. 2d 124.

Is there evidence sufficient in support of the charge of speeding to take the case to the jury on the first issue? While plaintiff alleges in her complaint that the truck of Transit Company was being operated in a fast, reckless and dangerous manner at an unlawful speed of 65 miles per hour, she testified that the truck was traveling around 65 to 75 miles per hour because she "couldn't see nothing but the light when I saw it."

Bearing in mind that the truck was coming toward her, and that it was in the night time, the suggested speed of 65 to 75 miles per hour would seem to be guesswork and contrary to human experience and without probative value. *Tysinger v. Dairy Products,* 225 N.C. 717, 36 S.E. 2d 246; *Ingram v. Smoky Mountain Stages, Inc.,* 225 N.C. 444, 35 S.E. 2d 337.

Moreover, the physical facts refute the charge of recklessness on the part of the driver of the truck.

Indeed, the testimony of the witness Penegar is to the effect that as the truck was coming up it was coming on the right side, at a good rate of speed, about 45 (the lawful rate for a truck at the time and place) and started slowing down, and when the stop light turned to "Go", the operator increased its speed and went on through and there was a crash. And the witness testified that the truck was about two car lengths, 100 feet at most, from intersection when the light turned green, and that he did not see the other car before the collision, and that the collision occurred in the middle of the intersection.

Is there evidence shown in the case on appeal sufficient in probative value to support the charge of negligence as against defendants Transit Company and Minton to take the case to the jury? In this connection, the principle prevails in this State that what is negligence is a question of law, and when the facts are admitted or established, the court must say whether it does or does not exist. "This rule extends and applies not only to the question of negligent breach of duty, but also the feature of proximate cause," *Hoke, J.,* in *Hicks v. Mfg. Co.,* 138 N.C. 319, 50 S.E. 703. *Reeves v. Staley,* 220 N.C. 573, 18 S.E. 2d, 239, and cases cited.

Furthermore, it is proper in negligence cases to sustain a demurrer to the evidence and enter judgment as of nonsuit: "1. When all the evidence taken in the light most favorable to the plaintiff fails to show any actionable negligence on the part of the defendant * * * 2.

When it clearly appears from the evidence that the injury complained of was independently and proximately produced by the wrongful act, neglect, or default of an outside agency or responsible third person." *Smith v. Sink*, 211 N.C. 725, 192 S.E. 108; *Powers v. Sternberg*, 213 N.C. 41, 195 S.E. 88, and *Butner v. Spease*, 217 N.C. 82, 6 S.E. 2d 808.

Finally, if it be conceded that there is evidence tending to show that the speed of the truck was excessive and, therefor, *prima facie* unlawful, it is manifest from the evidence that its speed would have resulted in no injury but for the negligent act of the operator of the Ford automobile. Hence the proximate cause of the collision must be attributed to the gross and palpable negligence of the operator of the Ford as it appears from the testimony of the plaintiff, as in *Butner v. Spease, supra*.

It is worthy of note that the Act of the General Assembly amending subsection (1) of G.S. 20-38 defining the word "intersection" did not become effective until after July 1st, 1957, just 8 days after the collision in the instant case took place.

The judgment below is
Affirmed.