Helen GONYER, Administratrix of the Estate of Edward H. Gonyer, Plaintiff,

v.

James H. RUSSELL and Edmund Francis Reynolds, Defendants.

Civ. A. No. 2031.

United States District Court
D. Rhode Island.
March 19, 1958.

Albert Lisker, Walter J. Hennessey, Providence, R. I., for plaintiff.

John G. Carroll, Providence, R. I., for defendants.

DAY, District Judge.

The plaintiff in her capacity as administratrix of the estate of her late husband, Edward Gonyer, has brought this action under the provisions of Chapter 477 of the General Laws of Rhode Island, Revision of 1938, to recover damages for his death which she alleges was caused by the negligence of the defendants. The action was tried to the Court.

The accident resulting in the death of the plaintiff's intestate occurred on the Post Road, a public highway in the Town of North Kingstown in the State of Rhode Island at about 5 o'clock p. m. on June 25, 1955. The weather was clear and the road surface was dry. Post Road in the vicinity of the scene of the accident runs approximately north and south. It is a four lane cement highway, the two lanes on the westerly side thereof being for south bound traffic and the other two for traffic going in the opposite direction, and has a tar shoulder on both sides.

At the scene of the accident on the west side of Post Road, heading south, Yorktown Road intersects but does not cross Post Road at two points of entrance and extends westerly into a residential development known as Yorktown Manor. Decedent was a resident of this development at the time of his death.

At the time of the accident the defendant Reynolds as the employee of the defendant Russell was driving a large tractor and trailer, approximately 42 feet long, owned by Russell, in a southerly direction in the first or most westerly lane of said Post Road. The tractor and trailer weighed approximately 18,300 pounds and carried a load estimated to weigh between 5000 and 6000 pounds. Both the tractor and trailer were equipped with air brakes operated by the driver with a foot pedal and with hand operated air emergency brakes. According to the defendants these brakes were inspected daily and were in first class operating condition.

On June 25, 1955, the defendant Reynolds was 19 years of age and had been employed as the driver of the tractor and trailer for approximately three months. His only prior experience in the operation of such a unit was that gained from so-called practice in operating it in a vacant lot behind the garage of his employer. Riding in the cab of the tractor with him at the time was a boy whose age was between "six and nine years" who had gone along with him for a ride.

Reynolds in substance testified that while he was driving southerly in said first south bound lane at a point about 300 feet north of the northerly entrance to Yorktown Road, he first saw the Nash sedan, then being operated in the opposite direction by the decedent, ap-

proaching and turning toward the northerly entrance to Yorktown Road, in the inner north bound lane; that its directional signal was flashing, indicating its driver was planning to make a left turn across the highway in front of him into said Yorktown Road; that he (Reynolds) blew his horn to indicate to the decedent that he intended to proceed ahead and that he was then going about 30 miles per hour; that despite this signal of his intention, he reduced his speed to 15 miles per hour and that the Nash continued into the lane adjoining that in which he was proceeding and then stopped; that when the tractor and trailer was approximately 80 feet from the Nash it started up and that although he applied his brakes, reduced his speed and pulled his vehicle to the right to avoid the Nash, the latter vehicle ran into and struck the tractor at a point 3 to 4 feet easterly from the westerly line of said first south bound cement lane, the tractor and trailer being mostly off the cement lane and on the shoulder of the road as a result of his efforts to avoid a collision with the Nash. He admitted that there was no other vehicle in either of the so-called south bound lanes before the collision and that there was nothing to prevent his steering the unit operated by him to the left and thereby passing in the rear of the Nash.

After the collision the tractor and trailer continued southerly, struck and sheared a pole on the westerly side of the Post Road, and eventually came to a stop on the easterly shoulder of the Post Road headed in a northerly direction. It is also clear that the decedent was thrown from the Nash into the highway and was run over by one or more wheels of the tractor and trailer, receiving crushing injuries which resulted in his death.

The testimony of Reynolds at the trial conflicted in many vital respects with that which he gave in a pre-trial deposition taken in behalf of the plaintiff. In particular, in this deposition taken more than a year before trial, he testified that the collision occurred on the westerly shoulder of the highway at a point where the Nash was entirely or nearly entirely across the cement highway and on the shoulder of the road. His testimony was also contrary to that of an eye witness to the accident, one Thomas W. Wynn, who testified in behalf of the plaintiff. Wynn testified that the Nash was on the shoulder of the road when it was struck by the tractor and trailer and that the force of the collision "drove it back 20 to 25 feet into the highway". Although counsel for the defendants sought vigorously to discredit Wynn, I find no reason to disbelieve him and regard his testimony as more satisfactory and convincing than that of Reynolds.

Without reviewing here the testimony of Reynolds, Wynn and that of the other witnesses in detail, I am satisfied that the accident was not due to any emergency created by the decedent as claimed by Reynolds. Even if I were to accept his story that the decedent's motor vehicle was only 75 to 80 feet away when it began to cross the lane in which he was proceeding, which I do not believe, if Reynolds had used ordinary care he could and would have slowed down the tractor and trailer or steered it to his left into the other south bound lane, passed to the rear of the Nash and avoided the collision, but he failed to adopt either of these precautions. Cf. Simpson v. Gautreau, 1939, 62 R.I. 309, 5 A.2d 302. I find nothing in the evidence or in the reasonable inferences to be drawn from it to warrant the conclusion that the decedent was guilty of any negligence that contributed to the accident and his death. On the contrary I find that the sole and proximate cause of the accident and death of the decedent was the negligence of the defendant Reynolds in failing to operate and control the tractor and trailer in a reasonably careful manner in the circumstances then existing. Since it is conceded that Reynolds was employed by the defendant Russell at the time of the accident and was acting in the course and scope of his said employment, it follows that the latter is also responsible for the damages caused by the former's negligence.

As hereinbefore pointed out, this is an action to recover damages for the death of the plaintiff's intestate under the provisions of Chapter 477 of the General Laws of Rhode Island, Revision of 1938. The rule for the ascertainment of the measure of damages in such actions is stated by the Supreme Court of Rhode Island in McCabe v. Narragansett Electric Lighting Co., 1904, 26 R.I. 427 at page 434, 59 A. 112, 115 to be as follows:

"The cause of action is the statutory action * * * for the recovery of damages for death caused by 'the wrongful act, neglect or default of another,' and the measure of damages in this form of action is the pecuniary loss sustained. Nothing can be given in this action by way of solace for wounded feelings, or for the bereavement suffered, or for the pain and suffering of the deceased, and nothing for loss of society of the husband and father. * * *

"It is obvious, too, that the loss sustained by the plaintiff here is the present value of the net result remaining after his personal expenses are deducted from his income or earnings. To ascertain this it is, of course, necessary to ascertain first the gross amount of such prospective income or earnings; then to deduct therefrom what the deceased would have to lay out as a producer, to render the service or to acquire the money that he might be expected to produce, computing such expenses according to his station in life, his means and personal habits, and then to reduce the net result so obtained to its present value. [citations.]"

At the time of his death the decedent was 44 years of age and in excellent health. He was and had been a member of the United States Navy for more than ten years, performing the duties of a cook with the rank of petty officer. While the evidence as to his gross monthly earnings was not as exact as it might well have been, it is clear that after taxes he was paid $267 per month in salary. In addition certain benefits for quarters, rations and clothing, amounting to $114.60, were paid each month to the plaintiff as his wife.

The plaintiff testified as to the personal living expenses of the decedent. As is usual in this type of case, various figures given by her constituted her best estimates; no records of them over the years had been kept and it cannot be reasonably expected that they would have been kept. Counsel for the parties differed widely in their respective ideas as to the amount of these expenses and consequently in their ideas of what may reasonably be said to have been the decedent's net income. Considering all of the testimony of the plaintiff, including that relating to the habits and station in life of the decedent, I am of the opinion that the decedent's net income was about $1,250 per year.

Testimony offered by the plaintiff and life tables introduced by the defendants indicate that the decedent had a life expectancy ranging from approximately 21 to approximately 26 years, the latest life expectancy table giving him the longest expectancy. In any event, such tables are merely guides to assist a court or jury in arriving at its verdict. And life expectancy is not to be regarded as synonymous with work expectancy. It is not to be presumed that the decedent would be able to follow his usual occupation up to the moment of the termination of his life even though he continued to live for the maximum life expectancy accorded to him by one of said mortality tables. Having in mind the nature of decedent's occupation, it would seem to me that 21 years would more fairly represent his reasonable work expectancy.

■ According to the annuity table introduced in evidence the present value of the decedent's expected net annual income for 21 years on an annuity basis discounted at the rate of 4 per cent, which I deem reasonable, would be approximately $17,500. Realizing as I do that in cases of this sort the damages

cannot be determined with mathematical certainty, I believe that an award to the plaintiff in the sum of $17,500 would be fair and reasonable and would do substantial justice between the parties.

Judgment shall be entered in favor of the plaintiff in the sum of $17,500 against both defendants.