ADA REAVES BRYANT, EXECUTRIX OF THE ESTATE OF ALFRED A. BRYANT, DECEASED v. EDWARD EARL WOODLIEF AND ROY PEARSON RAY

(Filed 18 May, 1960.)

**1. Negligence § 8—**

The test of whether the negligence of one tort-feasor is insulated as a matter of law by the independent act of another is whether such intervening act and the resultant injury could have been reasonably foreseen.

**2. Negligence § 27—**

The question of whether the independent act of one tort-feasor insulates the negligence of another is ordinarily for the determination of the jury, and it is only when the evidence is susceptible to the sole reasonable conclusion that the intervening and independent act could not have been reasonably foreseen that nonsuit is proper on this ground.

**3. Automobiles § 41b—**

Evidence that the operator of a motor vehicle was traveling in excess of 80 m.p.h. *is held* sufficient to be submitted to the jury on the question of whether such negligence was a proximate cause of a collision with another vehicle, since it cannot be said as a matter of law the driver could not have reasonably foreseen that some accident or injury was likely to occur as the result of such excessive speed.

**4. Automobiles § 41h—**

Testimony of the driver of a car that he saw a car approaching from the opposite direction at a speed which he estimated at 100 m.p.h., together with evidence that he turned left to enter a driveway in the path of such other car when it was between 200 to 600 feet away, *is held* sufficient to be submitted to the jury on the questions of such driver's negligence and proximate cause in a suit for the death of a passenger in his vehicle resulting from the collision of the cars.

**5. Automobiles § 43—**

Evidence tending to show that the driver of one vehicle was traveling in excess of 80 m.p.h. along a straight section of highway, and that the driver of the vehicle in which plaintiff's testate was riding as a passenger, traveling in the opposite direction and intending to enter a driveway on his left, turned left across the path of the first vehicle when it was some 200 to 600 feet away, *is held* sufficient to be submitted to the jury on the question of the concurring negligence of both drivers in proximately causing the collision.

**6. Death § 6—**

In an action for wrongful death the measure of damages is the present worth of the pecuniary loss resulting to the family of the deceased by reason of his untimely death, which loss is to be ascertained by deducting his personal expenditures from the amount which deceased would probably have earned, based upon his life expectancy.

**7. Same—**

    The retirement income which a deceased was receiving at the time of his death is properly shown in evidence on the question of damages in an action for wrongful death, since such retirement income is earned by an employee as the result of his previous labors, and evidence that the deceased was earning such income is alone sufficient basis for the admeasurement of damages.

APPEAL by defendants from *Sink, Emergency Judge,* Second September Civil Term, 1959, of WAKE.

This is a civil action to recover damages for wrongful death.

About 4:30 p.m. on 22 November 1958 the automobiles operated by the two defendants were approaching each other on a rural paved road near Raleigh, known as Rhamkatte Road, which runs generally east and west. The defendant Woodlief was traveling east and the defendant Ray was traveling west. The plaintiff's testate was a passenger in the defendant Ray's car. From the point at which the collision occurred the road was straight and practically level for four-tenths of a mile west and five-tenths of a mile east. At the western end of this straight stretch of road there was a curve and a small hill, with a church being located in the curve on the south side of the road. As the defendant Woodlief came over the hill and around the curve, he could see in an easterly direction for nine-tents of a mile and was at that time four-tenths of a mile from the point of collision. When the defendant Ray came to the eastern end of this straight stretch of road, traveling in a westerly direction, he could see nine-tenths of a mile to the hill and curve in which the church was located and five-tenths of a mile to the point of collision. When the defendant Ray reached the point of collision he could see four-tenths of a mile west-wardly up to the hill and curve referred to hereinabove.

At the point of collision there was a private driveway leading from the south side of the road to a house occupied by Janie McLean, who was also a passenger in the Ray car and who was killed as a result of the collision. Just west of this house and driveway there are two other houses and driveways, all on the south side of Rhamkatte Road. The house referred to as Janie McLean's house was the easternmost of the three houses. The house of Isaac Kearney was the third or westernmost of the three houses. From the west side of the first driveway, Janie McLean's driveway, to the west side of the westernmost driveway at the Kearney house, was 124 feet and six inches.

The evidence tends to show that the defendant Ray was driving on the right-hand side of the road at a slow rate of speed and was proceeding in a westerly direction for the purpose of taking his cook,

Janie McLean, to her home. Just before defendant Ray reached the intersection of Janie McLean's driveway, he testified that he gave a left-hand turn signal, that he gave this signal while traveling a distance of about twenty feet and came almost to a stop, waiting for an automobile to pass which was traveling in an easterly direction. Before starting to make his turn to the left into the McLean driveway, the defendant Ray first looked to his front and to his rear, and not observing any traffic he started to make his left turn across the road towards the driveway. He was traveling at a speed of only two or three miles per hour, according to his evidence, when he made his turn. But just before he started his turn, the defendant Ray testified that he observed the Ford automobile driven by the defendant Woodlief approaching him from the west on Rhamkatte Road, at a speed estimated by the defendant Ray of 100 miles per hour. Plaintiff's eyewitness, Isaac Kearney, III, testified that the Woodlief Ford was 600 feet away from the Ray car when the Ray car began its turn. Other testimony tended to show that the Woodlief car was within 200 or 250 feet of Ray's car when it turned left across the road.

The witness Kearney testified that the defendant Woodlief, as he came around the curve traveling towards the point of collision, was traveling at a speed of 85 to 90 miles per hour.

George Edward Jones, a witness for the plaintiff, who was standing in his yard, testified, "I observed the red and cream Ford over a distance of * * * approximately 275 to 300 feet prior to * * * impact. I formed an opinion * * * that the Ford was going in the neighborhood of 80 to 90 miles an hour before the collision. * * * I saw the Ford apply its brakes, the wheels appeared to be locked and smoke was boiling out from under the tires * * *. The car proceeded on after it * * * hit the Chevrolet (Ray's car) in the right-hand side, close to the front door. * * * I saw the * * * Chevrolet * * * knocked into the air and the Ford went under it and proceeded on down the road another 75 to 100 feet, something like that. * * * The Chevrolet * * * was knocked down the road approximately 60 to 70 feet from the point where it was struck."

The evidence tends to show that the Ford car came to rest 30 or 40 feet farther away from the point of collision than did the Chevrolet.

The evidence further tends to show that the defendant Woodlief's car skidded in a straight line in his lane of travel for a distance of 197 feet prior to the impact; that the front wheels of Ray's car were entering the McLean driveway at the time of the collision. The paved portion of the road where the collision occurred is twenty feet wide.

The defendant Woodlief testified that the "operator of the Ray car gave no signal at all."

The plaintiff's testate was 73 years of age with a life expectancy, according to G.S. 8-46, of 8.48 years. Plaintiff's testate was in good health, was able to get around in his yard, and had recovered from a broken hip. The hip was broken on 10 May 1957. Plaintiff's testate was drawing $140.28 per month from the Railroad Retirement Board at the time of his death. Living expenses of plaintiff's testate, according to the opinion of plaintiff, were $35.00 per month. Plaintiff was 52 years of age at the time of her testate's death and not eligible for railroad retirement benefits and will not be until she reaches sixty years of age. She is receiving no income from this source at the present time.

On the issue of negligence the jury found the plaintiff's testate was injured and killed by the joint and concurrent negligence of the defendants as alleged in the complaint and answered the issue of damages in the sum of $8,401.34.

From the judgment entered on the verdict, both defendants appeal, assigning error.

*Manning & Fulton for plaintiff.*
*Armistead J. Maupin for defendant Ray.*
*Smith, Leach, Anderson & Dorsett for defendant Woodlief.*

DENNY, J.  Each defendant assigns as error the refusal of the court below to sustain his motion for judgment as of nonsuit.

The appellant Woodlief insists that if he was negligent his negligence was insulated by the negligence of the defendant Ray in turning his car in front of him, and he cites in support of his position *Hudson v. Transit Co.*, 250 N.C. 435, 108 S.E. 2d 900; *Aldridge v. Hasty*, 240, N.C. 353, 82 S.E. 2d 331; and *Butner v. Spease*, 217 N.C. 82, 6 S.E. 2d 808.

The test of whether the negligent conduct of one tort feasor is to be insulated as a matter of law by the independent act of another, is well settled by our decisions. In *Harton v. Telephone Co.*, 141 N.C. 455, 54 S.E. 299, the Court said: " * * * the test * * * is whether the intervening act and the resultant injury is one that the author of the primary negligence could have reasonably foreseen and expected * * *. We think it the more correct rule that, except in cases so clear that there can be no two opinions among men of fair minds, the question should be left to the jury to determine whether the intervening act and the resultant injury were such that the author of

the original wrong could reasonably have expected them to occur as a result of his own negligent act. * * *" *Hinnant v. R. R.*, 202 N.C. 489, 163 S.E. 555; *Beach v. Patton*, 208 N.C. 134, 179 S.E. 446; *Gas Co. v. Montgomery Ward & Co.*, 231 N.C. 270, 56 S.E. 2d 689; *Moore V. Plymouth*, 249 N.C. 423, 106 S.E. 2d 695.

In our opinion, the cases relied on by the appellant Woodlief and cited above are not controlling on the factual situation revealed by this record.

The *Hudson* case involved a collision which occurred at an intersection governed by a traffic control signal, with the defendant Miller having a red light in his traffic lane until defendant Minton, who was driving the defendant Transit Company's truck, was 75 feet from the intersection approaching from the opposite direction at a speed of approximately 45 miles per hour, when traffic lights for both operators simultaneously turned green. Defendant Miller then made a left turn directly in front of Minton when the truck driven by Minton was so close that a collision was unavoidable. We upheld a nonsuit as to the Transit Company and its driver.

In *Aldridge v. Hasty, supra*, the defendant Burns turned to his left directly in front of the defendant Hasty when Hasty was 20-25 feet away. In the instant case, the defendant Woodlief testified that he was from 100 to 200 feet away from the McLean driveway when the defendant Ray cut across the highway in front of him. The physical facts seem to warrant the inference that he was more than 200 feet away when he saw the Ray car making a left turn, since he managed to apply his brakes and his car left tire and skid marks after the brakes were applied for 197 feet before reaching the point of impact.

In the *Butner* case, while traveling at night and at such time when he should have known his hand signal for a left turn could not be seen by the approaching car because his hand would be in the shadow of his own lights, defendant Spease turned to his left and directly in front of Butner's car at a time when the vehicles were only some forty feet apart.

In the consolidated cases of *Henderson v. Powell* and *Rattley v. Powell*, 221 N.C. 239, 19 S.E. 2d 876, at the time of the accident complained of, the plaintiffs Henderson and Sylvester Rattley, intestate of the plaintiff administratrix, were guest passengers in an automobile owned and operated by George McCrimmon. McCrimmon pulled into the path of a train approaching at a speed of approximately 60 miles per hour, with resultant injuries to plaintiff and injuries resulting in the death of Sylvester Rattley. In reversing a judgment as of nonsuit in the lower court, as to the defendant railroad, this Court

said: "The defendants insist that their negligence, if any there was, would not have produced the injury to the plaintiffs without the negligence of McCrimmon; and therefore it stands insulated, leaving McCrimmon's intervening negligence the sole proximate cause. The converse of this statement is universally accepted as true, and is thus expressed in a leading case: 'When several proximate causes contribute to an accident, and each is an efficient cause, without the operation of which the accident would not have happened, it may be attributed to all or any of the causes; but it cannot be attributed to a cause unless without its operation the accident would not have happened.' *Ring v. City of Cohoes,* 77 N.Y. 83, 90. It took the combined activities of the railroad company and McCrimmon to bring their respective vehicles into the collision inflicting the injury. The formula proposed by defendants would exonerate both of them with equal impartiality."

There is ample evidence on this record to support the plaintiff's contention that the defendant Woodlief was operating his automobile at an excessive and unlawful rate of speed, to wit, 80 to 90 miles per hour as he approached the point of collision. In light of the evidence on the record before us, it cannot be said as a matter of law that the defendant Woodlief could not reasonably have foreseen that some accident or injury was likely to occur as the result of his excessive speed. *Moore v. Plymouth, supra.*

With respect to the evidence against the defendant Ray, in our opinion, when the evidence against him is considered in the light most favorable to the plaintiff, it was sufficient to carry the case to the jury. It was within the province of the jury to determine whether or not the defendant Ray exercised reasonable care under the circumstances in turning his car into the path of an approaching car which he testified was in his opinion approaching him at a speed of 100 miles per hour; and the greatest distance between the Woodlief car and the Ray car at the time defendant Ray began his left turn, was fixed by the plaintiff's witness Kearney at 600 feet, and the shortest distance between the two vehicles when the defendant Ray began his left turn was 100 to 200 feet, testified to by the defendant Woodlief.

In our opinion, the court below properly overruled the respective motions for judgment as of nonsuit, and we so hold.

The most serious question raised by both defendants and assigned by both as error was the admission of evidence in the trial below to the effect that plaintiff's testate was a retired railroad employee and was drawing the sum of $140.28 per month from the Railroad

Retirement Board at the time of his death. Both defendants insist that such evidence was inadmissible and that the court below committed error in allowing the jury to consider such evidence in determining the pecuniary loss sustained by the plaintiff as the result of her testate's wrongful death.

G.S. 28-174 provides: "Damages recoverable for death by wrongful act. — The plaintiff in such action may recover such damages as are a fair and just compensation for the pecuniary injury resulting from such death."

The defendants insist and seriously contend that the pecuniary value of the life of plaintiff's testate is limited to the net income which the deceased might reasonably have been expected to earn from his own labors had his life not been cut short by his untimely death. *Caudle v. R. R.*, 242 N.C. 466, 88 S.E. 2d 138; *Lamm v. Lorbacher*, 235 N.C. 728, 71 S.E. 2d 49; *Journigan v. Ice Co.*, 233 N.C. 180, 63 ,S.E. 2d 183; *Queen City Coach Co. v. Lee*, 218 N.C. 320, 11 S.E. 2d 341; *Carpenter v. Power Co.*, 191 N.C. 130, 131 S.E. 400; *Purnell v. R. R.*, 190 N.C. 573, 130 S.E. 313; *Poe v. R. R.*, 141 N.C. 525, 54 S.E. 406; *Russell v. Steamboat Co.*, 126 N.C. 961, 36 S.E. 191.

Ordinarily, in an action for wrongful death the plaintiff's evidence presents no facts that would warrant any formula or method for ascertaining the fair and reasonable compensation for the pecuniary injury resulting from wrongful death, other than that laid down in the above cases. Even so, we do not understand that the general rule in this respect would exclude the inclusion of income from an annuity, life estate, retirement pay or other income for life only, in arriving at the pecuniary loss sustained by reason of wrongful death.

In *Poe v. R. R.*, *supra*, it is said: "This Court has not prescribed any 'hard and fast rule' by which to bind the jury in making the estimate of what sum should be given or to require them to give the assessment of the damages in any particular way."

In the case of *Mendenhall v. R. R.*, 123 N.C. 275, 31 S.E. 480, a proper charge in such case was given and its form was commended as a safe one for guidance in the opinion of *Poe v. R. R.*, *supra*, and is as follows: "The measure of damages is the present value of the net pecuniary worth of the deceased to be ascertained by deducting the cost of his own living and expenditures from the gross income, based upon his life expectancy. As a basis on which to enable the jury to make their estimate, it is competent to show, and for them to consider the age of the deceased, his prospects in life, his habits, his character, his industry and skill, the means he had for making money, the business in which he was employed — the end of it all

being to enable the jury to fix upon the net income which might be reasonably expected if death had not ensued, and thus arrive at the *pecuniary worth of the deceased to his family.* You do not undertake to give the equivalent of human life. You allow nothing for suffering. You do not attempt to punish the railroad, but you seek to give a fair, *reasonable pecuniary worth of the deceased to his family,* under the rule which I have laid down. You should rid yourself of all prejudice, if you have any, and of sympathy. It is not a question of sympathy; it is just a plain, practical question, and you should give a reasonable and fair verdict upon all the issues." (Emphasis added)

In *Collier v. Arrington,* 61 N.C. 356, it is said: " * * * our statute, which gives an action to the representative of a deceased party, who was injured or slain by a trespasser, confines the recovery to the amount of *pecuniary injury.* It does not contemplate *solatium* for the plaintiff, nor punishment for the defendant. It is therefore in the nature of pecuniary demand, the only question being, *how much has the plaintiff lost by the death of the person injured?"* (Emphasis added)

In *Kesler v. Smith,* 66 N.C. 154, the opinion states: "The defendant in open court admitted the unlawful killing, and the sole point at issue and tried was the question of damages." In discussing this point, *Reade, J.,* speaking for the Court, said: "The English statute (9-10 Vic., ch. 93) is substantially the same as ours. It is not precisely as definite as ours as to the rule of damages, inasmuch as our statute specifies *'pecuniary injury,'* whereas the English statute also makes it the duty of the jury to apportion the damages among the beneficiaries, which ours does not.

"Although the English statute omits *pecuniary,* yet the rule of damages which the courts have laid down is 'the reasonable expectation of pecuniary advantage from the continuance of the life of the deceased.' We have carefully examined the English cases, and although the rule is not laid down in all of them in precisely these words, yet in substance it is; and *the rule* may now be said to be *settled* as above."

It will be noted that the pecuniary worth of a life in a wrongful death case was not limited in our earlier cases to the net income the deceased would probably have earned during his life expectancy had his life not been terminated by wrongful death.

In *Gurley v. Power Co.,* 172 N.C. 690, 90 S.E. 943, the plaintiff administratrix instituted the action to recover for the wrongful death of a boy of 13 or 14, who was drowned in a tank at a substation of the defendant power company. On appeal from a verdict for plaintiff,

there was an exception to the charge on the issue of damages. The Court said: "This charge was evidently quoted by the judge from the opinion in *Mendenhall v. R. R.*, 123 N.C. at p. 278, which has been approved often by this Court (see Anno. Ed.), down to *Ward v. R. R.*, 161 N.C. at p. 186, and *Massey v. R. R.*, 169 N.C. 245 * * *. The charge in regard to measure of damages is in exact accord with the precedents of this Court." This exception was overruled, but a new trial granted on other grounds.

It will be noted that the charge in the *Mendenhall* case said nothing about limiting the pecuniary loss by reason of the wrongful death to income the deceased probably would have earned by his own exertions had his life not been cut short by his wrongful death.

The general rule for the measure of damages as laid down in our later cases, as set forth in *Caudle v. R.R., supra,* and many other cases, in all probability grew out of the necessity for differentiating between income earned from personal exertions and income derived from investments or from an established business that would not be adversely affected by the wrongful death.

In the recent case of *Armentrout v. Hughes,* 247 N.C. 631, 101 S.E. 2d 793, the question presented was whether or not the plaintiff was entitled to recover nominal damages where there is no evidence of actual damages. The Court by majority vote held that the nominal damages under such circumstances were not recoverable. *Rodman, J.,* speaking for the Court in a very scholarly opinion, traced the history of the statute now under consideration and said: "Our statute has from its passage been interpreted to accord with the interpretation given by the English courts to Lord Campbell's Act."

In the case of *Franklin v. South Eastern Rwy. Co.* (1858), 3 Hurlstone & Norman 211, 157 Eng. Repr. 448, the action was instituted for wrongful death and the Court's ruling is succinctly stated in the syllabus of the opinion as follows: "In an action by a father for injury resulting from the death of his son, it appeared that the father was old and infirm, that the son, who was young and earning good wages, assisted his father in some work for which the father was paid 3s. 6d. a week. The jury found that the father had a reasonable expectation of benefit from the continuance of his son's life: — Held, that the action was maintainable."

In Halsbury's Laws of England, Third Edition, Volume 28, Negligence, page 102, it is said: "Damages are not given merely in respect of the loss of a legal right, inasmuch as they are distributed among relations only and not among all individuals sustaining the loss, and

they should be calculated with reference to the amount of reasonable expectation of pecuniary benefit from the continuance of the life."

We have been able to find only one case directly in point from other jurisdictions in this country on the question now before us. On the other hand, we have not been able to find any opinion by any court in this country that has held that the admission of evidence in a wrongful death action with respect to retirement income is improper.

In the case of *Heskamp v. Bradshaw's Adm'r.*, 294 Ky. 618, 172 S.W. 2d 447, the action was instituted to recover for the wrongful death of C. W. Bradshaw. On appeal it was contended, as it is in the case now before us, that it was error to allow the plaintiff to prove that for some years prior to his death Mr. Bradshaw had been the recipient of a pension. It was argued that plaintiff's decedent had not earned any money for several years and that he was not able to earn money at the time of his death. Mr. Bradshaw was 78 years of age and had a life expectancy of 6.21 years at the time of his death. He was in good health and unusually active for a man of his age. He was an employee of the Louisville & Nashville Railroad Company for more than forty years, and was a division superintendent when he was retired on a pension in 1922. At the time of his death he was receiving retirement pay in the sum of $146.01 each month. The Court said: "But, say appellants, the proof as to the pension received by the decedent was incompetent and afforded the jury a false basis on which to rest their verdict. The precise question has never been decided by this court, and there is a dearth of authority on the subject. The decedent had earned the pension by his services in the past, and, under such circumstances, it is more reasonable to believe that a pension will continue until the pensioner's death than to believe that any salary or wages being earned by a man of advanced years will continue until his death. That a workman is earning wages at the time of his death is a circumstance to be considered by the jury in fixing the amount of damages, but it is only one element and must be considered in connection with other pertinent facts. *West Kentucky Coal Company v. Shoulder's Adm'r.*, 234 Ky. 427, 28 S.W. 2d 479. We think a pension, especially a type such as the one received by the decedent in this case which very probably will continue until the recipient's death, is a proper element to be considered by the jury in arriving at a verdict in an action brought for damages for the death of a person by tortious act pursuant to Kentucky Statutes, § 6, K.R.S. 411.130. Such a pension is a substitute for earning power. It follows that the court did not err in admitting evidence concerning the decedent's pension."

In the case of *Bridges v. Charlotte*, 221 N.C. 472, 20 S.E. 2d 825, it was held that payments from a retirement fund to teachers after they had ceased to serve, were not offensive to Article I, Section 7, of our State Constitution, in that they were regarded as in the nature of delayed compensation for public services rendered or delayed payments of salary.

Certainly, plaintiff's testate through long years of labor, earned everything paid to him by the Railroad Retirement Board and everything that would have been paid to him had his life expectancy not been cut short by his wrongful death.

In our opinion, the facts compel the conclusion that the plaintiff has suffered a pecuniary loss that is fixed and certain, less the reasonable personal living expenses which in all probability plaintiff's testate would have expended for his own support and maintenance had he lived out his expectancy.

We hold, therefore, that the admission of the evidence complained of was competent, and this assignment of error is overruled as to both defendants.

It is not intended that this opinion shall alter, modify or overrule any of our previous opinions dealing with the measure of damages for wrongful death. The fact is, in this case, we are confronted with a factual situation not heretofore presented to this Court. However, we are constrained to hold that our wrongful death statute includes pecuniary loss of the character involved in this case.

There are numerous other assignments of error, but in our opinion there were no prejudicial errors committed in the trial below that would justify or warrant the awarding of a new trial.

In the trial below we find no error in law.

No error.