Mary L. PRAY, Individually and as
Administratrix of the Estate of
Earl S. Pray

v.

NARRAGANSETT IMPROVEMENT
CO. et al.

No. 80–280–Appeal.

Supreme Court of Rhode Island.

Sept. 3, 1981.

924 ■■■ ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

Bradford Gorham, Providence, for plaintiff.

Asquith, Wiley & Ryan, Providence, Harry W. Asquith, Edward W. Moses, John M. Booth, Providence, for defendants.

## OPINION

SHEA, Justice.

This action arose out of an automobile collision. The plaintiff administratrix, Mary L. Pray, who is the widow of Earl S. Pray, sued John Everson (Everson), the driver of the automobile which collided with the decedent; his employer, Narragansett Improvement Co. (Narragansett), and the plaintiff's and her decedent's insurer, Union Mutual Insurance Co.; for damages arising out of the wrongful death of her husband. Mrs. Pray resolved her claim against Union Mutual prior to trial and voluntarily dismissed that party with prejudice. At the close of all the evidence, the trial justice granted a directed verdict in favor of the defendant Narragansett. The plaintiff's claim against the defendant Everson was submitted to the jury, which returned a verdict for the plaintiff in the amount of $58,829. Judgment was entered accordingly, including interest at the rate provided by law. Everson's motion for a new trial was denied.

The plaintiff appeals from the directed verdict in favor of Narragansett. Everson filed cross-appeals on several grounds, each of which will be addressed separately. He objects to certain evidentiary rulings and instructions of the trial justice, to the computation of the damages and interest thereon, to the alleged unresponsiveness and excessiveness of the jury's verdict, and to the denial of his motion for a new trial.

The accident occurred at around 11 a.m. on April 3, 1974, in Foster, Rhode Island, at the point where Boswell Road meets Route 6. The plaintiff's decedent died at the scene. Consequently, defendant Everson was the sole eyewitness. Everson testified that Route 6 is a four-lane highway divided by a yellow center line with broken lines on either side separating lanes of travel. He was traveling easterly along Route 6 in the extreme right-hand lane at fifty miles per hour, the posted speed limit. He was driving an MG sports car and at the time was on his way to work in Providence from his home in Danielson, Connecticut.

Everson testified that in the easterly direction of travel, Route 6 contains a slight upgrade. It peaks and then slopes downward before reaching the intersection with Boswell Road. Because of this condition he could not see Boswell Road before he reached the peak of the grade. According to Everson, he first saw decedent's automobile when it was approximately 125 to 150 feet away as it was crossing Route 6 from a restaurant parking lot on the north side of the road to head south into Boswell Road. He estimated the speed of the Pray vehicle to be about three to five miles per hour. Everson said that he applied the brakes hard when he saw decedent's vehicle and tried to maintain control over his own car. He did not attempt to swerve either to the right or to the left to avoid colliding with decedent's automobile. His way to the right was blocked by a telephone pole, trees, and brush. He did not go left for fear of hitting a car approaching from the opposite direction, although Everson was not sure if any other traffic was oncoming because decedent's vehicle blocked his view. He stated that an evasive maneuver at fifty miles per hour would have cost him the control of his car, so he tried to stay in his lane, and to brace himself, "hop[ing] for the best." The testimony and photographs in evidence established that the front of Everson's car struck the right side of decedent's vehicle at the front, broadside.

On the date of the collision, Everson was employed as a mechanic for Narragansett, a

road-construction enterprise owned by his father. Everson testified that he bought the MG he was driving several days prior to the accident and that in order to drive it before registering it, he had affixed to his car an "in transit" motor-vehicle registration plate belonging to Narragansett. Such plates are issued by the Registry of Motor Vehicles for use on heavy construction equipment when it travels to and from construction sites on public roads.[1] Everson testified that he had never received instructions regarding the proper use of in transit plates. He had commuted to work on the Monday and Tuesday prior to the accident using the in transit plate on his car. For a short period before he purchased the car, Everson had used one of the company pick-up trucks to commute to and from work.

On the day before the accident, Everson's father noticed that the in transit plate was on his son's car. At the time, the car was parked on a public street outside the company's premises. According to Everson, his father told him to take the plate off the car. Everson responded that he would take if off when he registered the car in Connecticut.

Everson's father corroborated the fact that at his place of business there were no oral or written instructions on the use of in transit plates. He recalled seeing the plate on his son's car and telling Everson that it did not belong on his personal automobile. He also testified to telling his son to get the car properly registered and to take the plate off. He said that when he made this statement to his son, he did not mean that his son should first get the car registered and then remove the plate. He testified that his son "knew what I meant" and that he expected his son to remove the plate, to move the car into Narragansett's parking lot, and to drive a company pick-up truck home.

I

The plaintiff has appealed the granting of a directed verdict in favor of Narragansett. She advances several theories to support her claim that the trial justice committed error in ruling that there was no evidence to support a finding of Narragansett's responsibility. We will deal only with her statutory argument because our decision on that ground will dispose of her appeal.

■ In considering a motion for a directed verdict, this court must do what the trial justice was called upon to do in the first instance. We examine the evidence and all inferences reasonably flowing therefrom in the light most favorable to the plaintiff. We do not pass on the credibility of witnesses or the weight of the evidence. We then determine whether or not there is evidence for the jury to consider which could warrant a finding in favor of the plaintiff. If we conclude that there is evidence supporting the plaintiff, or that there is evidence on which reasonable minds could differ, the jury is entitled to decide the facts of the case. *DeCarvalho v. daSilva*, R.I., 414 A.2d 806 (1980); *Johnson v. Palange*, R.I., 406 A.2d 360 (1979). In the case before us, we must determine whether or not the evidence viewed from plaintiff's perspective could allow reasonable minds to find that Everson's use of Narragansett's in transit plate at the time of the accident could bring about Narragansett's responsibility, under the law, for decedent's death. We hold that the trial justice decided correctly that the use of the in transit plate as it was used in this case could not create liability on the part of Narragansett.

The regulation and the use of in transit registration plates is governed by G.L. 1956 (1968 Reenactment) §§ 31–3–14(b) and 31–3–21(b). Section 31–3–14(b) states, "The registry shall issue plates designated as 'in transit' plates for use on special mobile equipment." Section 31–3–21(b) elaborates, "In transit plates may be used to operate or move special mobile equipment upon the highways solely for the purpose of moving such equipment to and from the location of any type of construction." The definition of "mobile equipment" is found in § 31–1–9:

---

1. General Laws 1956 (1968 Reenactment) §§ 31–3–14(b) and 31–3–21(b).

"Every vehicle not designed or used primarily for the transportation of persons or property and only incidentally operated or moved over a highway, including but not limited to [enumerated construction equipment]. The term does not include house trailers, dump trucks, truck mounted transit mixers, cranes or shovels, or other vehicles designed for the transportation of persons or property to which machinery has been attached."

A reading of the statute establishes that there is no merit to plaintiff's argument that the issue of Narragansett's financial responsibility is a jury question. The use of the in transit plate on Everson's car did not cause the car to be registered in the name of Narragansett. Under the statute a number of in transit plates are issued to an individual or a company that serves as the registry's "agent" on the use and control of the plates. The plaintiff argues that affixing such a plate to any kind of vehicle registers that vehicle to the owner of the in transit plate. Once so registered, the vehicle and its drivers, plaintiff reasons, are governed under the provisions of §§ 31–33–6 and 31–33–7. Section 31–33–6 deems that a nonowner driver operates an automobile with the owner's consent as the owner's agent. The second section presumes that a vehicle involved in an accident when registered in the name of the owner was indeed being operated with the consent of the owner.

The plaintiff relies on *Avedesian v. Butler Auto Sales, Inc.*, 93 R.I. 4, 170 A.2d 604 (1961). There an automobile involved in a collision bore dealer's registration plates. "Dealer plates" are issued in the same manner as in transit plates. *Id.* at 14, 170 A.2d at 609. Their effect, however, is quite different. On the day of the accident, the employee's wife had used the car to perform family errands and then left it parked in the driveway until the son took it. While driving it, he became involved in the accident from which the law suit arose. There was conflicting testimony regarding the employee's right to use the dealer plates when not on his employer's business and also regarding how the car itself had come into the employee's possession.

This court held that the issue of the dealer's status and liability as a statutory owner, pursuant to what is now § 31–33–6, was a question of fact for the jury to decide. The court said that although at all relevant times the dealer's employee bore the mark of an "owner"—having the ability to possess or control the car—the employee's authority to attach the dealer's plates to the vehicle, which the jury could find from the evidence, would make the dealer the owner and the employee his agent under the statute. *Id.* at 15, 170 A.2d at 609.

The plaintiff argues that the facts in this case require the same result. She argues that the car that Everson drove, under the law, belonged to Narragansett by virtue of the in transit plates. Further plaintiff argues the driver, Everson, was an agent of Narragansett at the time of the accident.

This case is distinguishable from *Avedesian.* We hold that the issuance of in transit plates by the Registry of Motor Vehicles creates no authority to use them for any purpose or on any vehicle other than that specifically provided by statute. A passenger car is expressly excluded. Therefore, we conclude that Narragansett was not an owner or possessor of Everson's car within the meaning of § 31–33–6, and we furthermore conclude that Everson's car was not on the road with Narragansett's consent, pursuant to § 31–33–7. There is no authority under those sections of the statute for use of the in transit plate as it was used here. Since there was no legal authority for Everson to attach the plate to his car, the trial justice did not err in granting a directed verdict in favor of Narragansett.[2]

---

**2.** The trial justice so ruled finding no evidence from which to conclude that Narragansett could have been the owner. Our reasoning differs slightly in that he did not consider the provision of G.L. 1956 (1968 Reenactment) § 31–1–9 in reaching his conclusion. Our authority to sustain a correct judgment of a lower court for different reasons is well settled. *Berberian v. Rhode Island Bar Association*, R.I., 424 A.2d 1072, 1072 n.1 (1981).

## II

■ We turn now to consider the issues that defendant Everson raises on his cross-appeal. First, Everson contends that the trial justice erred when he admitted into evidence a diagram of the accident scene prepared by plaintiff's accident reconstruction expert, John P. Hatch. He is an associate professor of mechanical engineering and applied mechanics at the University of Rhode Island. Professor Hatch testified that he visited the scene of the accident on May 29, 1974, read the police report, made observations and measurements, and drove an automobile at fifty miles per hour through the collision area in order to determine its stopping distance. He testified that the stopping distance of an automobile traveling at fifty miles per hour under the dry and daylight conditions that prevailed on April 3, 1974, was 237 feet. He further stated that a driver of an automobile heading east on Route 6 with a line of sight thirty-six inches above the ground (roughly the eye level Everson had) could see those parts of an automobile at the Boswell Road intersection which were more than one foot above the ground at least 375 to 389 feet before the intersection. Professor Hatch gave detailed and extensive testimony regarding the measurements contained in the diagram that he had prepared and which was introduced in evidence. The defendant objects to alleged inaccuracies in his testimony and points out that the diagram was prepared nearly six years after the accident had occurred.

There is no merit to defendant's objection on this point. The professor testified that he visited the scene less than a month after the accident and that he prepared a report two days later. He used figures contained in the police report, which was itself admitted into evidence. He also made his own observations and measurements and drew the diagram in scale to conform to them, also using measurements contained in the other sources in the record. Under the circumstances the trial justice properly admitted the diagram into evidence. Furthermore, the jury was aware that the witness based some of his observations on his own measurements, experiments and computations. The jurors were capable of evaluating the results in order to reach their own conclusions regarding the probative value of the tests and measurements. The relatively minor inconsistencies that defendant elicited from Hatch on cross-examination affected only the weight the jurors might have given to the witness's direct testimony but not its admissibility.

## III

■ Everson's second claim is that the trial justice erred in instructing the jury regarding the duty of a driver who is approaching the crest of a hill. In the middle of his instructions the trial justice charged the jury as follows, quoting from G.L. 1956 (1968 Reenactment) § 31–14–3:

"Another rule of the road that *may have application depending upon how you view the evidence* * * * is entitled Conditions [R]equiring [R]educed [S]peed, and that is 31–14–3 of our General Laws. It reads in pertinent part as follows: 'The driver of every vehicle shall [* * *] drive at an appropriate reduced speed when approaching * * * a hill crest * * *.'" (Emphasis added.)

The defendant argues that the instruction is inappropriate because the evidence of the highway's topography shows a slight rise and a downgrade or a levelling off rather than a hill crest west of the point of collision.

There was uncontroverted evidence in the record of an upgrade and downgrade in the road at a point to the west before the collision site and that this condition at least partially obstructed a driver's view of the entire road surface before he reached a certain point. The trial justice properly submitted to the jurors' judgment whether or not the road conditions warranted their application of the rule he stated. He therefore did not unduly prejudice defendant's case, nor did he improperly take issues of fact away from the jury.

## IV

The defendant next objects to the failure of the trial justice to give the jury his requested instruction number 8.[3] The request reads:

"8. The law states that a person must not abandon a place of safety for a position of danger unless a person does so in the exercise of reasonable care for his own safety, and a person who crosses a highway in a needless and oblivious manner is not in the exercise of reasonable care for his own safety."

The trial justice instead drew on another rule of the road found in § 31–17–5, instructing that "[t]he driver of a vehicle about to enter or cross a highway from a private road or driveway shall yield the right-of-way to all vehicles approaching on said highway."

The testimony in the record shows that decedent left a parking lot on the north side of Route 6 and proceeded south across it toward Boswell Road. The jury charge covered both this evidence and defendant's request fairly. Refusal to grant the request was not reversible error. *Caparco v. Lambert*, R.I., 402 A.2d 1180 (1979); *Hamrick v. Yellow Cab Co.*, 111 R.I. 515, 304 A.2d 666 (1973).

## V

Everson contends next that the trial justice erred when he allowed into evidence the amounts of pension income and social security payments which decedent would have received monthly. Mrs. Pray testified in detail about her husband's income from pensions received by him after his retirement and also his usual living expenses. The plaintiff's economic expert, Professor Arthur Mead, an assistant professor of economics at the University of Rhode Island, projected future income and expenses over Mr. Pray's life expectancy. Us-

ing these amounts, he testified to his computations regarding the loss to the estate and present value. Everson argues that it was error to consider these amounts because decedent did not earn payments from these sources through physical or mental exertion.

The Wrongful Death Act, G.L. 1956 (1969 Reenactment) §§ 10–7–1 through 10–7–13 provides for the method of determining pecuniary damages. The relevant portion of § 10–7–1.1, as amended by P. L. 1971, ch. 46, § 1 states:

"Pecuniary damages to the beneficiaries described under § 10–7–2 of this chapter and recoverable by such persons shall be ascertained as follows:

1. Determine the gross amount of the decedent's prospective income or earnings over the remainder of his life expectancy, including therein all estimated income he would probably have earned by his own exertions, both physical and mental."

The defendant argues that the expression "by his exertions, both physical and mental" are words of limitation upon the phrase "prospective income or earnings." He cites *Wiesel v. Cicerone*, 106 R.I. 595, 261 A.2d 889 (1970), which is one of the latest in a well established line of cases concerning computation of damages in actions for wrongful death. This court has said that to arrive at a proper figure of lost income or earnings the factfinder must "deduct what the decedent would have had to expend as a producer * * * to acquire such income or earnings * * *." *Id.* at 599, 261 A.2d at 892.[4] However, the specific issue raised here is one of first impression in this jurisdiction. None of the opinions of this court have heretofore dealt with the income of a retiree who has ceased productive activity prior to the time of his death.

In the few cases deciding this matter, courts have uniformly held that income

---

3. The defendant specified as error the trial justice's failure to instruct the jury according to his requests numbered eight through eleven. However, he briefed and argued only number 8. Under Rule 16(a) of our Appellate Rules the remaining requests for instruction are therefore

waived. *See State v. Jamgochian*, 109 R.I. 46, 280 A.2d 320 (1971).

4. *Romano v. Duke*, 111 R.I. 459, 304 A.2d 47 (1973), is this court's most recent statement of the rule.

from pension funds, retirement plans, social security benefits, and other like sources is to be considered in calculating loss in a wrongful-death case. *See University of Delaware v. Munson*, 316 A.2d 206 (Del. 1974); *Miller v. Tuten*, 137 Ga.App. 188, 223 S.E.2d 237 (1976); *Bryant v. Woodlief*, 252 N.C. 488, 114 S.E.2d 241 (1960); *Pridham v. Cash & Carry Building Center, Inc.*, 116 N.H. 292, 359 A.2d 193 (1976); *Gatenby v. Altoona Aviation Corp.*, 277 F.Supp. 1011 (W.D.Pa.1968); and *see generally annot.*, 81 A.L.R.2d 949 (1962); 22 Am.Jur.2d *Death*, § 157 (1965). The United States Court of Appeals for the First Circuit accepted use of the decedent's pension in computing loss in *Boston and Maine R. R. v. Talbert*, 360 F.2d 286 (1st Cir. 1966). Courts define income broadly for purposes of wrongful-death actions. However, they do exclude some sources, such as income from invested capital because it is completely unrelated to physical or mental exertions. *Underwood v. Old Colony Street Railway Co.*, 33 R.I. 319, 80 A. 390 (1911); *Bryant v. Woodlief*, 252 N.C. at 496, 114 S.E.2d at 247.

We hold that the inclusion of pension and social security income was not error. That type of income is rightfully part of decedent's earnings; it is a direct result of his physical or mental exertions, for which payment was deferred. In our opinion the statutory language of § 10–7–1.1 which is controlling is "the remainder of his life expectancy." Life expectancy is not the same as work expectancy. *Romano v. Duke*, 111 R.I. 459, 463 n.4, 304 A.2d 47, 50 n.4 (1973) (citing *Gonyer v. Russell*, 160 F.Supp. 537 (D.R.I.1958)). The statute does not speak of earnings until retirement.

The First Circuit Court of Appeals endorsed the Federal District Court's findings of loss under Rhode Island law based upon the decedent's "earning capacity" in *Williams v. United States*, 435 F.2d 804 (1st Cir. 1970). The court held that the calculation of loss was correctly determined by the number of years in the future that the

decedent would have been involved in actual daily labor. The Legislature responded directly to the *Williams* court in subparagraph 1 of the 1971 amendment by extending the point of reference beyond a decedent's employment expectancy. Hence, the Legislature very clearly intended to include income that was not only earned before but also received during retirement under the terms of § 10–7–1.1.[5]

### VI

■ The defendant next claims that the trial justice erred in refusing to delete the interest that the court clerk added to the jury's verdict. Everson argues that since under § 10–7–1.1 the jury's award was reduced to its present value as of the date of the verdict, that amount should not have been increased by the addition of interest as provided by G.L.1956 (1969 Reenactment) § 9–21–10, as amended by P.L.1977, ch. 10, § 1. Section 9–21–10 states:

"In any civil action in which a verdict is rendered or a decision is made for pecuniary damages, there shall be added by the clerk of court to the amount of damages, interest at the rate of eight percent (8%) per annum thereon from the date the cause of action accrued which shall be included in the judgment entered therein. This section shall not apply until entry of judgment or to any [contractual] obligation where interest is already provided or as to any condemnation action."

One of the purposes of § 9–21–10 is to promote the early settlement of claims. *Roy v. Star Chopper Co.*, 584 F.2d 1124 (1st Cir. 1978), *cert. denied*, 440 U.S. 916, 99 S.Ct. 1234, 59 L.Ed.2d 466 (1979); *Isserlis v. State Director of Public Works*, 111 R.I. 164, 300 A.2d 273 (1973). The application of the prejudgment-interest statute to this case is not contrary to that purpose.

■ A jury's verdict in a wrongful-death action is necessarily inexact because it must rely on predictions of the future value of a decedent's earnings. *Romano v.*

---

5. The Legislature also diverged from *Williams* by providing in the amendment consideration of the future trend of earnings, whether infla-

tionary or deflationary. *See Romano v. Duke*, 111 R.I. at 463, 304 A.2d at 50.

*Duke, supra.* "Present value" discounts the award to that amount which, if presently received, could be invested in order to yield the future sum.

The effect of simultaneously applying both §§ 9–21–10 and 10–7–1.1 is to allow interest to accrue upon interest as well as upon an award when the jury returns its verdict for damages in this kind of a suit. We hold, however, that in view of § 9–21–10, the trial justice did not err in refusing to delete the amount added as interest from the time the cause of action first accrued. He would have had no authority to prevent the addition of interest pursuant to § 9–21–10. The nature of the prejudgment-interest statute was settled long ago by this court in *Kastal v. Hickory House, Inc.*, 95 R.I. 366, 187 A.2d 262 (1963), construing an earlier version of § 9–21–10:

> "In our opinion the statute is neither ambiguous nor equivocal. It speaks imperatively and directly not to the court but to the clerk who is ordered to add 'to the amount of damages, interest thereon from the date of the writ * * *.' This is a purely ministerial act; it contemplates no judicial intervention. The legislative fiat is explicit and admits of no conditions or reservations. The claim for damages having been duly reduced to judgment the addition of interest is peremptory."
> *Id.* at 369, 187 A.2d at 264.

The Legislature has since amended the statute several times. Of significance are (1), the change in the date from which interest may accrue [6] and (2), the proscription of the statute's application to certain types of cases.[7] These do not change the essential characteristics of § 9–21–10 as this court found them in *Kastal.*

The statute is no less clear now than when this court decided *Kastal.* The Legislature has, in fact, provided even greater clarity. Such interest as the statute contemplates is applicable to "any civil action" that results in a pecuniary award. Section 9–21–10 does not apply to actions in contract in which interest is already provided

or to condemnation action. The Legislature enacted these exclusions by P.L.1976, ch. 146, § 1, years after it enacted the computation procedure of § 10–7–1.1 by P.L.1971, ch. 46, § 1. We do assume that the Legislature well understood the operation of § 10–7–1.1 at the time it amended § 9–21–10 in 1976. It could have excluded actions for wrongful death from the ambit of § 9–21–10. It chose not to do so.

> "In the face of a statute so clear and unambiguous there is no room for the application of the usual canons of statutory construction. In such a case the statute declares itself. We may not where no ambiguity exists search beyond the statute for a different meaning. Even hardship does not justify a court in reading into a statute something contrary to its unequivocal language. Only when the legislature sounds an uncertain trumpet may the court move in to clarify the call. But when the call is clear and certain as it is here we may not consider whether the statute as written comports with our ideas of justice, expediency or sound public policy. In such circumstances that is not the court's business." [Citations omitted.] *Kastal v. Hickory House Inc.*, 95 R.I. at 369, 187 A.2d at 264–65.

## VII

The final issue defendant presents on appeal concerns the trial justice's denial of his motion for new trial. Everson contends that the jury's verdict was against the weight of the evidence and that the award of damages was excessive.

The rule concerning motions for new trial is well settled. In considering the motion with respect to either liability or to damages, the trial justice must exercise his independent judgment, consider all the material evidence in light of his charge to the jury, and pass on the weight of the evidence and the credibility of the witnesses. *Barbato v. Epstein*, 97 R.I. 191, 196 A.2d 836 (1964). If the trial justice properly per-

---

**6.** Public Laws 1977, ch. 10, § 1.

**7.** Public Laws 1976, ch. 146, § 1.

forms these duties, this court will not disturb his decision unless the moving party is able to show that the trial justice overlooked or misconceived material evidence or was otherwise clearly wrong. *Borowski v. Gelco I.V.M. Leasing Co.*, R.I., 397 A.2d 1315 (1979).

Our review of the entire record satisfies us that the trial justice properly performed his function in denying the motion for new trial. He neither misconceived nor overlooked material evidence, nor was his decision plainly wrong. He thoroughly reviewed the testimony of each witness and noted specifically his observations regarding the credibility of each witness and the weight of his or her testimony. The trial justice expressly exercised his independent judgment, stating that he was satisfied that the defendant "really did not keep a proper lookout." He stated that the testimony of the plaintiff's accident-reconstruction expert firmly supported what the defendant said took place on April 3, 1974. He accepted the testimony of the plaintiff's economic expert, noting also that the jury's deliberative process quite clearly expressed itself in a damage award of several thousand dollars less than the expert's final figure. The trial justice concluded that had he sat as a seventh juror throughout the trial, he would have reached the same verdict. Hence, we sustain his ruling on the motion.

For all the foregoing reasons, the plaintiff's appeal is denied and dismissed, the defendant's cross-appeal is denied and dismissed, the judgment is affirmed, and the papers of the case are remanded to the Superior Court.