Amy **TOTMAN**

v.

Doris **VERNON, Executrix.**

No. 83–344–Appeal.

Supreme Court of Rhode Island.

June 18, 1985.

F. Monroe Allen, Providence, for plaintiff.

Joseph DeAngelis, Lori Caron Silveira, Letts Quinn & Lichat, Providence, for defendant.

## OPINION

KELLEHER, Justice.

In this Superior Court civil action, a jury found that an implied contract for the payment for services rendered by the plaintiff to the defendant's decedent had in fact existed for a period of approximately eight years. The jury then awarded the plaintiff the sum of $23,000. The trial justice denied the defendant's motion for a new trial as it applied to the issue of liability but ordered a remittitur on the verdict of $3,000. The remittitur has been filed, and the defendant has appealed. Hereinafter we shall, for the most part, refer to the plaintiff, her sister, and her brother-in-law by their first names.

Amy's sister Mary was married to William Greenwood. At the time of the trial, Amy was seventy-eight years of age, retired, a widow, and a resident of Winchester, Massachusetts. She had been retired since September 30, 1969. For many years Mary and her husband William lived in Kingston, New Hampshire. Kingston is about an hour's ride from Winchester.

There was a close relationship between the Greenwoods and Amy, and when Mary had a disabling stroke in 1964, Amy would "go up" to Kingston three or four times a week to do what she could to make her sister as comfortable as possible. Her chores included cooking, bathing Mary, changing and washing the bed linen, and cleaning up the premises. According to Amy, Mary preferred to have her sister minister to her personal needs and would "put up a fuss" if William tried to take over Amy's chores. In her testimony Amy made it clear that she never expected any compensation for the services she performed for her sister.

Mary died on June 2, 1967. After the funeral services, Amy and her son and daughter-in-law drove William home. When the quartet reached their destination, the brother-in-law remarked to Amy, "I suppose I'll never see you now. You'll never come to see me." Amy responded, "Of course, Bill, I'll come to see you if you want me to. I might not be able to come as often as I did, but I will come." Amy told the jury that William responded by saying that "he would take care of me for doing this."

Amy's uncontroverted testimony was that she continued to visit William three or four times a week thereafter, purchased food for him, cooked meals for him, washed the dishes, mopped and vacuumed his house, did the laundry, changed his bed linen, drove him to the seashore or to appointments, wrote checks for him, and generally kept him company. She always drove or was driven in her own car and paid for the gasoline for these trips. She reported she spent about $10 a week on small food purchases, for which William never offered to reimburse her. When Amy mentioned to her brother-in-law that the trips were "starting to be quite a drain * * * physically and financially," William once again told Amy that he was going to take care of her. When the subject was raised on later occasions, he first told her that he was going to make a will, and later disclosed that he had made a will, leaving one-fourth of his estate to Amy. Amy made it clear that she, now being retired, would have been unable to finance the continued visits had he not promised to provide for her. The testimony given by Amy was to some extent corroborated by her niece and her son, both of whom testified that they did hear William say that he would indeed take care of Amy.

The record indicates that in 1969 William did execute a will, in which he bequeathed one-fourth of his estate to Amy. However, it appears that in 1975 William left New Hampshire and moved to Smithfield, Rhode Island, where he lived with his nephew,

Edward Vernon, on a permanent basis. On February 24, 1977, William, who was then eighty-seven, executed a new will, in which he bequeathed $2,000 to Amy and, except for some other minor bequests, left his entire estate to his nephew.[1] The will was admitted to probate in April 1978, Amy filed a claim against the estate, which was disallowed, and this litigation ensued.

In his appeal defendant complains that although the sole ground of the complaint was an express rather than an implied contract, at trial the trial justice allowed the introduction of evidence supporting a theory of implied contract; that the existence of such an implied contract was not supported by clear and convincing evidence; and that the trial justice erred when he failed to instruct the jury that there was no evidence of any express promise by William to leave 25 percent of his estate to Amy for the services rendered by her to him.

We would first note that although an objection was lodged to the trial justice's failure to inform the jury of the lack of evidence of any express promise by William to pay 25 percent of his estate to Amy, defendant made no objection to the trial justice's instruction that Amy's right of recovery, if any, was to be based upon an implied rather than on an express agreement. The trial justice explained that he refused to charge as requested because of his belief that, in light of the charge, it was not necessary to point to the absence of any express contract. We see no reason to fault this conclusion.

In *Traversa v. Smith*, —— R.I. ——, ——, 437 A.2d 1358, 1360 (1981), this court once again emphasized that a plaintiff will be entitled to recover against an estate for services rendered a decedent " 'if the circumstances in which the services are rendered are such as to show a reasonable and proper expectation that compensation is to be made * * *.' "

In his outright rejection of defendant's motion for a new trial, the trial justice observed that there was "ample evidence" that the decedent requested Amy's companionship and services on many occasions, that he was very grateful for the services, and that all the circumstances gave credence to the concept that Amy reasonably expected to be compensated for those services through the decedent's will. These expectations, he said, were reinforced by the decedent's constant assurances that he would take care of her, with the clear implication being that he would take care of her by means of his will. He also thought it significant that William himself had expressed what he believed to be the reasonable value of Amy's services when he awarded her one-fourth of his estate, and it was obvious that Amy also believed from her continued efforts that the parties essentially agreed that that was to be the reasonable value of the services rendered. Thus, the jury's assessment of the value of Amy's claim, as amended by the trial justice, is amply supported by the record.

■ Essentially, this appeal is one from the denial of a motion for a new trial by a trial justice following a jury verdict. We have often said that in considering a motion for a new trial in a civil proceeding, the trial justice acts as the seventh juror and exercises his independent judgment and reviews the evidence in the light of his charge to the jury, passing on the weight of the evidence and the credibility of witnesses. In ruling on such a motion, the trial justice does not need to make an exhaustive analysis of the evidence but should refer to all the material evidence and facts on which he relies to support the reasoning of his ruling. If the trial justice has followed the rule and applied the proper standard, his decision will not be reversed unless he has overlooked or misconceived material evidence or was otherwise clearly wrong. *Gibbs Oil Co. v. Potter*, —— R.I. ——, 471 A.2d 207 (1984); *Zawatsky v. Cohen*, —— R.I. ——, 463 A.2d 210

---

1. Edward Vernon was originally named executor of William's estate. Upon Edward's death prior to trial, his wife Doris Vernon was substituted as executrix, d.b.n. c.t.a.

(1983); *Pray v. Narragansett Improvement Co.,* — R.I. —, 434 A.2d 923 (1981).

In this case there was no dispute concerning the applicable law, and there were no objections to the instructions given to the jury. In the absence of such objections, those instructions became the law of the case and were binding on the jury and the trial justice when he passed on the motion for a new trial. *Bennett v. Bennett,* — R.I. —, —, 433 A.2d 968, 970 (1981). Here the record clearly indicates that the trial justice complied with the principles to which we have just alluded; and in his consideration of the motion for new trial, he was aware that the burden fell upon Amy to prove her claim by clear and convincing evidence. He then spoke in terms of "ample" evidence in the record and reached the conclusion that the motion for a new trial should be denied. We have examined the record and are of the belief that the trial justice, in considering the motion for a new trial, neither overlooked nor misconceived material evidence nor was otherwise clearly wrong in reaching the conclusion that he did.

The defendant's appeal is denied and dismissed, the judgment appealed from is affirmed, and the case is remanded to the Superior Court.